STATE of Alaska, Appellant,

v.

Arthur B. McKINNON and Marilyn McKinnon, Appellees.

No. 6510.

Supreme Court of Alaska.

Aug. 5, 1983.

---

Leslie J. Ludtke and Peter B. Froehlich, Asst. Attys. Gen., and Wilson L. Condon, Atty. Gen., Juneau, for appellant.

Douglas L. Gregg, Juneau, for appellees.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

MATTHEWS, Justice.

In this case, the State appeals the superior court's dismissal of its suit to collect the unpaid balance of a veteran's business loan from Arthur B. McKinnon, one of the initial co-obligors. The superior court held that McKinnon had become a surety on the note by virtue of a partnership termination agreement and was subsequently released from his obligation because an agreement entered into by the State and his former co-partner and co-obligor, Charles Donald Tandy, had impaired McKinnon's right of recourse. We modify the judgment and affirm it as modified.

Defendant, McKinnon, and his half-brother, Tandy, purchased their father's business, Tandy Food Equipment, and entered into a partnership on March 17, 1967. On March 18, 1972, the half-brothers, both veterans, borrowed $25,000 each from the State of

Alaska, Division of Veterans Affairs [the Division]. A single ten-year note for $50,000 was executed. McKinnon, Tandy, and their respective wives, who were not partners in the business, were all parties to the note—the men as co-makers, and the women as accommodation parties. By the terms of the note, each signatory was jointly and severally liable. The promissory note further provided that the signatories "expressly agree that this note or any payment thereunder may be extended from time to time ... without in any way affecting the liability of such parties." Collateral consisting of stock and inventory in Tandy Food Equipment was used as security for the note. The proceeds of the loan were deposited into the business account of Tandy Food Equipment.

On October 18, 1972, McKinnon and Tandy terminated their partnership. The partnership termination agreement provided that Tandy would

> assume payment of any and all debts and obligations of the partnership including, but not limited to, all accounts payable and the balance owing to the State of Alaska Division of Veterans Affairs on that Promissory Note dated March 17, 1972, in the original principal sum of $50,000.00 and agrees to indemnify and hold withdrawing partner harmless from any and all claims which have or could arise out of the operation of the business known as Tandy Food Equipment.

Jack Tinsley, the director of the Division, was given notice of the termination through a letter from Tandy and McKinnon. The letter stated that Tandy "assumed McKinnon's obligation ... on the loan," but that "McKinnon [would remain] personally liable."

In December of 1979 the State brought suit against the McKinnons and the Tandys because loan repayments were delinquent. The McKinnons were, however, residing in Kodiak at the time, and were not served with process.[1] In that suit, Tandy confessed judgment for the entire amount owing on the original promissory note, and entered into a settlement agreement with the State whereby the State agreed not to execute on the judgment on the condition that Tandy repay the loan through reduced monthly payments over an extended period of time and that he sell the property securing the loan and apply the proceeds therefrom directly toward reducing the outstanding loan balance.

On December 12, 1980, the state loan collection office sent a demand letter to McKinnon. On March 25, 1981, the State of Alaska filed a complaint against Arthur and Marilyn McKinnon seeking collection of the outstanding balance of the $50,000 loan plus interest.

On June 18, 1981, the State moved for summary judgment under Civil Rule 56. The defendants opposed the motion and filed a cross motion for summary judgment. The superior court granted summary judgment to the McKinnons. It found that McKinnon had become a surety by virtue of the partnership termination agreement and that the State's action of entering into the confession of judgment and agreement not to execute with Tandy impaired the McKinnons' right of recourse within the meaning of AS 45.03.606(a)(1)[2] and, therefore, discharged the McKinnons. The State appeals.

### I

We first address the court's characterization of McKinnon as a surety.[3] We believe that this characterization was correct and therefore affirm this part of the summary judgment.

By the terms of the original promissory note the four signatories were jointly and severally liable for the entire $50,000 plus

---

1. No requirement of compulsory joinder applied to this case.

2. This conclusion obviated the need for the court to consider the issue of impairment of collateral under AS 45.03.606(a)(2).

3. There appears to be no dispute as to the status of McKinnon's wife as an accommodation party.

interest. The relationship between Tandy and McKinnon was then altered by the partnership termination agreement. In that agreement, Tandy agreed to assume the obligation of repaying the loan but McKinnon agreed to remain personally liable. The lower court's legal conclusion that this agreement produced a principal/surety relationship between Tandy and McKinnon is consistent with the intent of the parties as expressed in their agreement and in their letter to the Division, as well as with general suretyship law.[4] This change in McKinnon's status from co-obligor to surety in relation to third parties occurred through the operation of the October 18 partnership termination agreement regardless of whether the loan is considered a partnership liability.[5]

## II

We now must address the question of the extent to which McKinnon and his wife, as surety and accommodation parties respectively, were discharged by the arrangement between Tandy and the State to suspend enforcement of the judgment.

The court held that McKinnon was discharged under AS 45.03.606, which corresponds with UCC § 3–606. AS 45.03.606 states in pertinent part:

*Impairment of recourse or of collateral.* (a) The holder discharges a party to the instrument to the extent that without the party's consent the holder

(1) without express reservation of rights releases or agrees not to sue a person against whom the party has to the knowledge of the holder a right of recourse or agrees to suspend the right to enforce against that person the instrument or collateral or otherwise discharges the person, . . . .

We disagree with the court's conclusion. Section 606(a)(1) would discharge McKinnon as a surety in three situations. In the first situation, McKinnon would be discharged had the State "without express reservation of rights release[d] or agree[d] not to sue" Tandy. Although the State did not expressly reserve its rights against McKinnon, it also neither released nor agreed not to sue Tandy. In fact, the State did sue Tandy on the note, which suit resulted in Tandy's confession of judgment. In the second situation, McKinnon would be discharged if the State had agreed "to suspend the right to enforce against [Tandy] the instrument or collateral." The State, however, entered no such agreement. Indeed, as noted, the State did enforce the instrument against Tandy and in fact pursued the enforcement to judgment. While the State did agree to suspend the right to enforce its *judgment* against Tandy, it did not agree to suspend the right to enforce the *instrument*. McKinnon could finally claim discharge under section 606(a)(1) if the State "otherwise discharge[d]" Tandy. The word "otherwise" is broad and might encompass a discharge reached after judgment on an instrument. Assuming without deciding

**4.** The Restatement of Security § 83 (1941) provides in pertinent part:
The suretyship relation is created where the surety
. . . .
(d) having been one of several principal obligors, one or more of the other co-principals contracts to assume the entire duty of performance; . . .
Notice to the creditor and not actual consent is needed to bind him to the new arrangement. *Id.* comment f, § 114.

**5.** We believe that the State misconstrues the superior court's decision in focusing its appeal on the question of whether the debt belonged to the partnership or the individual makers. The court clearly rested its decision on the

Uniform Commercial Code provisions on suretyship and impairment of recourse codified in AS 45.03.606 and not the provisions of the Uniform Partnership Act found at AS 32.05.-310(c). Regardless of whether the debt is viewed as a partnership obligation, Tandy assumed the position of principal and relegated McKinnon to that of a surety by the agreement of October 18 whereby the partnership was also terminated. As support for the position that a suretyship relationship can be created through the action of co-makers, the court cited the Restatement of Security § 83(d) (1941). It is irrelevant that the parties were possibly mistaken in believing that the debt was a partnership obligation, since neither party to that agreement has challenged its validity or intent.

that that is so, there has clearly been no *discharge* of Tandy. He is still liable for the judgment on the debt, although he is meeting his liability over a longer time frame than originally contemplated. Therefore, we conclude that AS 45.03.-606(a)(1) does not discharge McKinnon.

■ Our conclusion that the Uniform Commercial Code does not apply here, however, does not compel the conclusion that the State may presently proceed against McKinnon. UCC § 1–103 provides that the common law applies where the UCC's provisions do not. AS 45.01.103. Additionally, we may affirm the judgment on alternative grounds, even if those grounds were not raised by the parties below. *Native Village of Eyak v. G.C. Contractors,* 658 P.2d 756, 758 (Alaska 1983); *see Moore v. State,* 553 P.2d 8, 21 (Alaska 1976); *Ransom v. Haner,* 362 P.2d 282, 285 (Alaska 1961). We believe that appropriate common law analysis supports the conclusion that McKinnon is not presently available for recourse but remains potentially liable on the note.

At common law, the State may pursue Tandy to judgment and still have recourse against McKinnon as surety. Assuming for the sake of analysis that the State obtained a judgment against McKinnon, which he satisfied, McKinnon would step into the State's shoes as its subrogee. L. Simpson, Handbook on the Law of Suretyship § 47 (1950); A. Stearns, The Law of Suretyship § 11.1 (J. Elder 5th ed. 1951); Restatement of Security § 141 (1941). As subrogee, McKinnon could have no more rights than were held by the State as subrogor. *Western Casualty & Surety Co. v. Brooks,* 362 F.2d 486, 491 (4th Cir.1966); *Maryland Casualty Co. v. Brown,* 321 F.Supp. 309, 311 (N.D.Ga.1971). The State could not sue Tandy presently to collect on its judgment, because he has remained current under the agreement not to execute. Tandy could raise this fact as a defense should McKinnon as subrogee sue him to recover for the payment made to the State.

In this situation, the traditional common law rule would discharge McKinnon as surety, because his right of subrogation against Tandy had been unilaterally impaired by the State. Stearns § 6.16; *see* Simpson § 73, at 352–53. McKinnon would be saddled with both a method of collection and an extended payment period to which he never agreed. This is analogous, although not identical, to the rule that an extension of a debt discharges the surety. Simpson § 73; Stearns § 6.16; 10 S. Williston, A Treatise on the Law of Contracts § 1222 (W. Jaeger 3d ed. 1967); Restatement of Security § 129 (1941). However, this common law rule has been subject to criticism. Among its critics was Justice Cardozo, who stated:

It is a rule of the common law that a surety is discharged from liability if the time of payment is extended by contract between the principal debtor and the creditor without the surety's consent. Even an extension for a single day will be sufficient to bring about the result. Without such an extension, the surety would have the privilege upon the maturity of the debt of making payment to the creditor, and demanding immediate subrogation to the latter's remedies against the principal. He must, therefore, it is said, be deemed to have suffered prejudice if, by extension of the due date, the right has been postponed. I have no doubt that this rule may justly be applied whenever the surety can show that the extension has resulted in actual damage, as where the principal in the interval has become insolvent, or the value of the security has been impaired, though even in such circumstances the measure of exoneration ought in justice to be determined by the extent of the damage suffered. Perhaps there might be justice in permitting exoneration whenever the surety had tendered payment of the debt, and demanded subrogation to the remedies against the debtor. Perhaps the burden of disproving prejudice ought to be cast upon the creditor. No such limitations have been recognized. The rule applies to cases where neither tender nor actual damage is established or pretended. The law has shaped its

judgments upon the fictitious assumption that a surety, who has probably lain awake at nights for fear that payment may some day be demanded, has in truth been smarting under the repressed desire to force an unwelcome payment on a reluctant or capricious creditor. The extended period has gone by; the surety has made no move, has not even troubled himself to inquire; yet he is held to be released on the theory that were it not for the extension, of which he knew nothing, and by which his conduct could not have been controlled, he would have come forward voluntarily with a tender of the debt. Such rules are survivals of the days when commercial dealings were simpler, when surety companies were unknown, when sureties were commonly generous friends whose confidence had been abused, and when the main effort of the courts seems to have been to find some plausible excuse for letting them out of their engagements. Already I see some signs of a change of spirit in decisions of recent dates. I think we may well ask ourselves whether courts are not under a duty to go farther, and place this branch of the law upon a basis more consistent with the realities of business experience and the moralities of life.

B. Cardozo, The Nature of the Judicial Process 152–55 (1945) (footnote omitted). *See also* Simpson § 73, at 353 (notes criticism that "rests upon the view that a complete discharge of the surety is out of proportion to the injury resulting from" the extension); 10 Williston § 1222 (the rule is "frequently criticized as going to an extreme in discharging entirely even when an extension of time has caused [the surety] no injury whatsoever, or a very slight one, ...").

We believe that criticism of the traditional rule is justified. There is undoubtedly some prejudice to a surety when an obligation is extended by the creditor, and there is a measure of prejudice to McKinnon in the situation at bar. Where the surety originally believed that its obligation would end upon the date of maturity set out in the note, in reality the period of obligation has been extended. In this case, not only is McKinnon's period of obligation extended, his subrogation right is impaired by the payment terms of the agreement not to execute. However, although we recognize the prejudice in these situations, we should not ignore the benefit that inures to a surety from an extension agreement. The surety does not have to pay the creditor immediately because the extension has delayed default by the principal, and may never have to pay if the extension allows the principal to satisfy its obligations, thereby preventing default. Even if default eventuates, the debt has been reduced by the amount that was paid under the extension agreement before default occurred. A similar outcome is apparent in the case of this agreement not to execute the judgment so long as Tandy continues to pay $200.00 per month. Tandy has reduced the principal of the debt since entering the agreement not to execute. McKinnon has benefited from the agreement by the amount of that reduction.

Therefore, we do not believe that the traditional common law rule which would completely discharge McKinnon withstands critical analysis. On the other hand, recognizing that McKinnon does suffer some prejudice from the agreement not to execute, we do not believe that he should be held to be presently liable on the original note. The State chose to pursue only Tandy and to enter a settlement with him that impaired McKinnon's right of subrogation. The payments from Tandy in accordance with the settlement should be the State's sole recourse as long as Tandy complies with the agreement not to execute. McKinnon remains secondarily liable, should Tandy ever default on his agreement with the State. At that point, the State could pursue McKinnon. Upon payment of the remainder of the debt, McKinnon would subrogate to the State's rights against Tandy. Tandy could no longer raise compliance with the agreement not to execute as a defense, since Tandy would have unilaterally breached that agreement. McKinnon's

subrogation rights would thus be unimpaired by that agreement.[6]

The judgment of the superior court should be modified in accordance with the preceding discussion. McKinnon is granted summary judgment, since the State cannot pursue him as surety as long as Tandy is current on his payments under the agreement not to execute judgment. However, McKinnon remains potentially liable as surety, should Tandy default on that agreement in the future.

AFFIRMED.

---

**6.** *Taines v. Capital City First Nat'l Bank,* 344 So.2d 273 (Fla.App.1977) indicates the propriety of a similar result in cases in which application of UCC § 3–606 is appropriate. In *Taines,* the creditor bank stipulated that it would not press its pending claim against the principal debtor if the debtor made certain payments. The court reasoned that the suspension of litigation agreement was equivalent to an extension of time on the original note, to which all parties had previously consented. *Id.* at 275–76. The court held that the accommodation parties had not been released and were still available for satisfaction of the debt.

In *Taines,* the parties to the suspension of litigation agreement, unlike Tandy in this case, had defaulted on payments under that agreement. The accommodation parties therefore had their subrogation rights restored at the time that the creditor resorted to them for payment, and thus would suffer no prejudice in an effort to gain reimbursement from the principal. The same will be true here, should Tandy ever default on the agreement not to execute judgment.