Gerald GUDENAU and Peter Milner,
individually and as partners d/b/a
Kelso Marine, Appellants,

v.

Albert BIERRIA and Susan
Bierria, Appellees.

No. S–4225.

Supreme Court of Alaska.

Feb. 4, 1994.

Rehearing Denied March 3, 1994.*

* Justice Bryner, Pro Tem., not participating.

Peter W. Giannini, Giannini & Associates, P.C., Anchorage, for appellants.

Steven P. Gray, Gray, Geveden, Cole & Razo, Kodiak, for appellees.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

RABINOWITZ, Justice.

### FACTS AND PROCEEDINGS

On March 4, 1985, Gerald Gudenau and Peter Milner, individually and as partners, d.b.a. Kelso Marine, purchased the F/V *Ivanof II*, a commercial fishing vessel, using at least in part monies borrowed from First National Bank of Anchorage (First National).

In April 1986 Gudenau entered into an agreement with Albert and Susan Bierria (Bierria), whereby Gudenau would sell the vessel to Bierria for $130,000. Bierria paid $10,000 down on the vessel. Bierria also executed a promissory note for the balance of the purchase price. Bierria made two additional payments in 1986 totalling $19,000.

In June 1987 the vessel's engine was damaged. The vessel was insured, and the hull and machinery underwriters acknowledged coverage. In order to begin repairs immediately, Bierria borrowed $27,000 from International Seafoods of Alaska, Inc. (ISA). Troy Bowers, Bierria's boat operator, signed a security agreement that gave ISA a security interest in Bowers' condominium and promised that ISA would be named on the insurance payment for the engine. Bierria began repairing the vessel in June 1987, and finished in early July 1987. Bierria submitted the repair costs as a claim to the hull and machinery underwriters.

Bierria missed the September 15, 1987 due date for an $18,000 payment owed to Gude-

nau. On September 16, 1987, Gudenau sent a demand letter to Bierria. Bierria decided to use insurance proceeds to pay Gudenau, and at Bierria's request, Highlands Insurance Co. notified Gudenau and First National that they would receive a check for $24,149.42 (the bulk of the claim for the engine repair) after they signed and returned a "RECEIPT, RELEASE AND HOLD HARMLESS AGREEMENT." Under this agreement, Gudenau and First National were made the check's sole payees, and they agreed to hold Highlands harmless against other claims on the insurance funds.

Gudenau and William McGrew, the vice-president of First National, executed the agreement on October 8. Soon thereafter, they received a check dated September 28, 1987. The bank did not endorse the check and credit it to Gudenau and Milner's account, however, until November 24. McGrew testified that the bank sent the check back to the insurance company after learning of its own potential liability under the hold harmless agreement. According to Gudenau's affidavit, First National endorsed the check only after Highlands agreed to release the bank from the hold harmless agreement. On October 19, 1987, Gudenau, through counsel, sent Bierria notice that he had taken possession of the vessel. Gudenau claimed that Bierria was in default of the contract on three grounds: nonpayment, incurring liens, and failing to insure the vessel. The parties tried unsuccessfully to negotiate a mutually satisfactory resolution of the dispute, but ultimately both sides filed suit.

This matter came before the superior court as several cases that were consolidated. Bierria sought a preliminary injunction, which was denied. Gudenau moved for partial summary judgment on the issue of Bierria's breach of the sales agreement. Bierria also moved for partial summary judgment, asking the superior court to order the vessel's return to Bierria, and to hold a trial on the issue of damages only.

The superior court granted partial summary judgment to Bierria, ruling that Gudenau wrongfully repossessed the *Ivanof II*. The superior court ordered the immediate return of the vessel to Bierria. At Gude-

nau's request, it stayed the return order pending the trial on damages. The superior court dissolved its stay partway through the trial. It entered final judgment ordering resumption of the payment schedule and payment by Gudenau of $236,960.42 in damages, $7,500.00 in attorney's fees, and $2,244.92 in costs, for a total money judgment of $246,705.34. It also ordered Bierria to secure the release of the ISA lien after satisfaction of the judgment.

On appeal Gudenau argues that the superior court should have granted summary judgment in his favor, holding that Bierria was in default on the contract as a matter of law, or at least should have denied Bierria summary judgment. He further argues that even if summary judgment on liability was appropriate, the superior court erred in ordering specific performance and calculation of damages.

## DISCUSSION

### I. DID THE SUPERIOR COURT ERR WHEN IT GRANTED SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY TO BIERRIA?

#### A. Under What Circumstances Was Gudenau Entitled to Retake the Vessel?

The sales agreement contains two provisions that discuss Gudenau's right to repossess the vessel. Under Term 3, if Bierria "should default on any part of this agreement and should fail to cure the default within 30 days after written notice by seller. [sic] Seller may began [sic] foreclosure precedings [sic] on the vessel." Term 18 gives Gudenau the power to respond immediately:

> 18. *Default.* The difficulty of securing to Seller assurance payment of the remainder of the purchase price requires Seller to reserve the right of summary repossession in the event of Buyer's default. Accordingly, Buyer agrees that any failure to perform in accordance with the terms and conditions set forth herein shall constitute an immediate default and Seller shall thereupon have the right to seize the vessel wherever it may be found, summarily and without notice, without prejudice to any claim which Seller may have against

Buyer pursuant to this charter party. Should Seller repossess the vessel, Seller shall attempt to resell it in a prompt and commercially reasonable manner....

■ Though there is an obvious tension between these provisions, two factors lead us to treat Term 3 as controlling. First, we generally read contracts so as to avoid forfeitures whenever possible. *Curry v. Tucker*, 616 P.2d 8, 13 (Alaska 1980). Given the ambiguity in the contract, that policy requires us to give more weight to Term 3.

■ Second, the intent of the parties seems to be that Term 3 would govern. Gudenau's response to the September 1987 default was to send a letter giving Bierria notice of default and thirty days to cure. This act suggests that Gudenau believed the thirty-day provision to be the one that governed. Moreover, he waited just over one month before retaking the boat. Also, Bierria's promissory note envisioned a thirty-day grace period. Thus, Gudenau was obliged to follow Term 3 in repossessing the vessel.

### B. *Was Gudenau Justified in Repossessing the Vessel?*

Though Bierria did not strictly comply with all of the terms of the agreement, the conditions for repossession had not been satisfied, and so Gudenau was not entitled to repossess the vessel.

### 1. *Form and Timing of Payment*

■ The parties agree that Bierria did not make the scheduled $18,000 payment by the September 15, 1987 deadline. One of the central questions in this appeal is whether the $24,149.42 insurance check dated September 28, 1987 and credited to Gudenau and Milner's bank account on November 24, 1987 qualifies as a cure within thirty days. That check represented the bulk of the insurance payment for repairs on the boat, and listed Gudenau and First National as payees. The superior court found that the payment was "made timely given the circumstances." We agree.

Because neither party disputes that the funds were ultimately credited to Gudenau and Milner's account at First National, the key issue becomes whether the circumstances surrounding the payment render it ineffective as a cure of Bierria's default. Gudenau points to a number of unusual attributes of Bierria's payment. Although many of these features arguably were outside the ordinary course of business, Gudenau waived any objection by accepting the payment.

Gudenau's strongest objection is that the hold harmless agreement rendered the check inadequate as payment. Bierria had signed a security agreement promising that ISA would be named a beneficiary on insurance payments. Gudenau argues that he himself "could not have the insurance proceeds without being willing to assume the liability to ISA for the repairs."

Gudenau is correct in arguing that this method of payment was problematic. Bierria had an obligation to make the 1987 payment. He had no right under the sales agreement to attach conditions to his payment, and Gudenau was not obliged to accept any additional obligations in order to receive the payment he was owed. *Cf. United California Bank v. Prudential Ins. Co. of America*, 140 Ariz. 238, 681 P.2d 390, 444 (App. 1983) (refusing to read into an agreement a constructive condition materially changing the obligations of a party).

Consequently, Gudenau and First National were not required to sign the hold harmless agreement, and payment was not "made" when they were notified of the existence of the check. On the other hand, once Gudenau and First National executed the hold harmless agreement, they accepted the form of payment Bierria had offered. Once they received the check, Gudenau had been paid.

A similar analysis applies to Gudenau's other objections to the form of the payment: that the proceeds belonged to First National, not Gudenau, and that Gudenau did not "control" the funds because the bank was also listed as a payee.[1] The money was ultimately credited to Gudenau and Milner's account, and although Gudenau had the right to re-

---

1. *See* AS 45.03.110(d) ("If an instrument is payable to two or more persons not alternatively, it is payable to all of them and may be negotiated, discharged, or enforced only by all of them.").

quire a more conventional form of payment, he chose not to do so.

▇▇▇ Gudenau notes that the insurance check was not credited to his account until after the thirty days had passed. Therefore, he contends, it was too late to constitute a cure even without the other complications. To this Bierria responds that the funds were available from October 8, and delay after that date was caused by the actions of Gudenau and First National. A check is proper payment for an obligation, and so long as the check is honored, the obligation is considered paid when the payee receives it. *See* AS 45.03.310; *see also Harper v. K & W Trucking Co.*, 725 P.2d 1066, 1068 (Alaska 1986). Thus, payment was "made" before thirty days passed.[2]

The fact that First National returned the check rather than endorsing it does not change the date payment is considered to have been made. First National and Gudenau jointly had control of the check, and so they could not use that control to render the payment late for purposes of the agreement. *See TSB Exco, Inc. v. E.N. Smith, III Energy Corp.*, 818 S.W.2d 417 (Tex.App.1991), *overruled on other grounds* (finding timely payment based on delivery date of checks, even though payees did not deposit them); *cf. Klondike Indus. Corp. v. Gibson*, 741 P.2d 1161, 1167 (Alaska 1987) (holding that when one party's bad-faith actions contribute to another party's failure to comply with a condition in their contract, the condition is excused).[3]

### 2. Maritime Liens

▇▇▇ Gudenau also claims that Bierria defaulted by violating the prohibition on liens in Term 16 of the sales agreement.[4] In order to finance the repair of the boat's engine, Bierria had to borrow money from ISA, and the agreement between Bierria and ISA listed the boat as collateral. Bierria's failure to make his insurance payments on time created a maritime lien as well.

Bierria argues that this term should not be read literally, and that there is no default unless Bierria fails to timely discharge the lien. He notes that the agreement obligated him to fish the vessel, and that he could not fish the vessel without incurring liens for crew and other necessities. Because Gudenau did not give Bierria notice that Term 16 had been violated and thirty days to cure, we need not decide how strictly Term 16 ought to be interpreted: it was not a basis for Gudenau's repossession.

### 3. Good Faith

▇▇▇ The superior court found that Gudenau "breached his obligation of good faith," although it cited no specific examples of bad faith. Gudenau challenges that finding on appeal. As Bierria correctly notes, however, the issue of good faith is not relevant to the basic question of whether there was a default without a cure.

## II. DID THE SUPERIOR COURT ERR WHEN IT ORDERED GUDENAU TO REDELIVER THE VESSEL TO BIERRIA?

Gudenau objects to the superior court's award of specific performance. He states that because he had fully performed his obligations under the sales agreement, Bierria should have brought an action for wrongful repossession rather than one for breach of contract. He does not explain, however, why Bierria would not be entitled to the vessel in

---

**2.** The stipulated facts do not discuss the exact date on which Gudenau received the check, nor does Gudenau's affidavit. Gudenau has not asserted that the check arrived after thirty days had passed, and so he has waived any such argument, regardless of when it actually arrived.

**3.** Gudenau complains that it was not the actions of "Gudenau and First National" that caused the delay, but rather solely those of First National, since he was willing to deposit the check. Nonetheless, since the stipulation of undisputed facts indicates that the same check that was sent initially was the one deposited, under AS 45.03.310 payment was timely in any event, because what controls is the date on which Gudenau first had possession of the check that was ultimately credited to his account.

**4.** Term 16 of the agreement reads:

16. *Liens.* Buyer shall neither incur nor permit any maritime liens or other encumbrances against the vessel other than for salvage until the purchase price is paid in full and shall not remove or deface any notice that may be posted on the vessel by Seller as evidence of said obligation.

an action for wrongful repossession. In fact, he cites AS 45.09.507(a), under which "disposition may be ordered or restrained on appropriate terms and conditions" if the secured party has acted improperly. This suggests that Bierria's rights are similar in either event.

Gudenau's second argument against specific performance is that "Bierria has yet to establish that he continued to be ready, willing, and able to perform under the Sales Agreement." Though Bierria owed significant sums of money at the time the dispute arose, his next payment under the contract would have been one year later, and in the amount of $18,000. Given his expression of willingness to continue under the contract, a conclusion that he would have been unable to pay after another summer of fishing would be too speculative. The superior court found that Bierria had shown probable income of $115,680.50 during the 1988 season.

Gudenau's final argument against specific performance is that the collateral is not "sufficiently unique" to warrant specific performance, and he particularly objects to the fact that the superior court decided this issue during Bierria's case in chief, so that Gudenau was not able to put on proof as to this issue. Bierria cites federal authority holding that a vessel is considered unique as a matter of maritime law. *See Plancich v. M/V Rodsand,* 1986 A.M.C. 2874, 2884, 1984 WL 91 (E.D.Va.1984).

Although the law does not appear to be as clear as Bierria suggests,[5] Gudenau's briefs do not respond to this argument. Moreover, the superior court found that return of the vessel would mitigate damages and put the parties closer than damages would to the positions they were in before breach. We decline to hold that the superior court exceeded the wide latitude that Alaska law gives it to fashion relief for wrongful repossession. *See* AS 45.09.507(a) (stating that "disposition may be ordered or restrained on appropriate terms" when the secured party proceeds improperly against the collateral); *cf.* AS 45.02.716(a) (allowing specific performance of contracts for the sale of goods "where the goods are unique or in other proper circumstances").

### III. *WAS THE SUPERIOR COURT'S CALCULATION OF DAMAGES CLEARLY ERRONEOUS?*

Gudenau argues that the superior court made a number of errors in calculating damages. Gudenau's first objection pertains to attorney's fees: he argues that the superior court could have awarded them only under Alaska Civil Rule 82. The superior court,

---

**5.** Generally, specific performance is warranted when money damages are inadequate. *Carcione v. Clark,* 96 Nev. 808, 618 P.2d 346, 348 (1980). As both sides in this case acknowledge, the modern trend has been to relax this requirement. *See* U.C.C. § 2–716 & cmt. 1 (1989) (U.C.C. revised in an effort "to further a more liberal attitude" with regard to specific performance).

Bierria cites to *Plancich* alone as evidence of the "principle of maritime law." The instant case, of course, is not a maritime case. A federal district court sitting in admiralty jurisdiction, in fact, would not have jurisdiction to hear a lawsuit seeking specific performance of a sales contract. *See Flota Maritima Browning de Cuba, S.A. v. Snobl,* 363 F.2d 733, 735 (4th Cir.), *cert. denied,* 385 U.S. 837, 87 S.Ct. 82, 17 L.Ed.2d 71 (1966); *International Shipping Co., S.A. v. Hydra Offshore, Inc.,* 675 F.Supp. 146, 151 (S.D.N.Y. 1987), *aff'd,* 875 F.2d 388 (2d Cir.), *cert. denied,* 493 U.S. 1003, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989); *Grand Banks Fishing Co. v. Styron,* 114 F.Supp. 1, 3 (D.Me.1953). An action for wrongful repossession is much closer to a suit for specific performance of a sales contract than to a traditional maritime action.

Although the parties do not explicitly discuss the general availability of specific performance in suits for possession of vessels, courts do consider specific performance as a remedy in such suits. *See, e.g., Clem Perrin Marine Towing, Inc. v. Panama Canal Co.,* 730 F.2d 186, 191 (5th Cir.), *cert. denied,* 469 U.S. 1037, 105 S.Ct. 515, 83 L.Ed.2d 405 (1984); *R.C. Craig Ltd. v. Ships of the Sea Inc.,* 345 F.Supp. 1066 (S.D.Ga.1972) (denying summary judgment against a ship buyer seeking specific performance); *Miller Yacht Sales, Inc. v. Scott,* 311 So.2d 762, 763 (Fla.App. 1975) (finding specific performance inappropriate because the injured party had already received liquidated damages), *cert. denied,* 328 So.2d 843 (Fla.1976). On the other hand, some courts have considered specific performance to be appropriate only for special boats. *See, e.g., Fast v. Southern Offshore Yachts,* 587 F.Supp. 1354, 1357 (D.Conn.1984) (specific performance of the vessel was "clearly warranted, as the customized yacht is undeniably unique"); *Kawa Leasing, Ltd. v. Yacht Sequoia,* 544 F.Supp. 1050, 1069 (D.Md.1982) (ordering specific performance "because of her uniqueness (she is, after all, the only Presidential yacht this nation has ever had)").

however, correctly followed Term 23 of the sales agreement, which specifically provides for reasonable attorney's fees.

■ Gudenau also argues that it was incorrect to award damages for the 1988 and 1989 fishing seasons, because projecting Bierria's profits was too speculative. He observes that Bierria operated at a loss in 1986 and 1987. The superior court heard testimony from a number of experts, however, at least one of whom was familiar with the *Ivanof II*.[6] Thus, review of the record persuades us that the superior court's findings are not clearly erroneous.

■ Gudenau's final objection to the damage award is that the superior court should not have awarded $32,000 for equipment lost or damaged during Gudenau's repossession, on the basis that the figure assumed the vessel was in excellent condition when repossessed. Yet Gudenau points to no damage that predated his repossession. Instead, he asserts the damage "should have been offset against the gross proceeds which Bierria claims he would have received through a bare boat charter to a permit holder." He cites no law in support of the argument. We therefore conclude that the superior court did not commit error by ordering Gudenau to pay for the damage it found that he caused.

### CONCLUSION

We AFFIRM the decision of the superior court.

BURKE, J., not participating.

---

**6.** This included testimony by Anita Stewart–Brechan, the business agent of the person who fished the *Ivanof II* during the 1988 season, and Pershing Hill, a Ph.D. in economics with 15 years experience as a commercial fisher. Mr. Hill testified that he had calculated Bierria's expected gross revenues for 1988 by looking at his shares of past harvests, and then assuming a similar share of future harvests, and multiplying the projected total catch by the actual price per pound. This is not "wild speculation."

Nor do we agree with Gudenau's reading of *State v. Stanley*, 506 P.2d 1284, 1293 (Alaska 1973). Gudenau implies that in *Stanley* we found loss-of-use damages to be too speculative categorically. Although we upheld the lower court's holding that after a certain number of years such damages would be speculative, we also approved the court's decision to award damages for the first 18 months of lost use. *Id.* at 1293 & n. 18. It is therefore curious to rely on *Stanley* to say that loss-of-use damages are so inherently speculative that it was clearly erroneous in this case for the superior court to award them for the period immediately following repossession.