**George H. BRADFORD and Elizabeth Bradford, Appellants/Cross–Appellees,**

v.

**FIRST NATIONAL BANK OF ANCHORAGE, indenture trustee and bondholder, Appellee/Cross-Appellant.**

Nos. S–7503, S–7323.

Supreme Court of Alaska.

Feb. 21, 1997.

---

Kenneth J. Cusack, Cusack & Knowles, P.L.L.C., Seattle, Washington, for Appellants/Cross–Appellees.

John R. Beard, Anchorage, for Appellee/Cross–Appellant.

Before COMPTON, C.J., and RABINOWITZ, EASTAUGH and FABE, JJ.

## OPINION

FABE, Justice.

## I. INTRODUCTION

The First National Bank of Anchorage (First National) brought an action against the 4M 2B Investors partnership (4M 2B) and each of 4M 2B's past and present general partners to collect the unpaid balance of a loan it made to 4M 2B. George H. Bradford and Elizabeth Bradford, two of 4M 2B's eleven original general partners, appeal from the superior court's judgment against them in that action. First National cross-appeals the superior court's decision to award it only a portion of the attorney's fees that it incurred in attempting to collect the debt. We affirm the judgment against the Bradfords and reverse and remand the award of attorney's fees.

## II. *FACTS AND PROCEEDINGS*

The Bradfords, along with four other couples and one individual, formed 4M 2B in 1983 to build, operate, and own the Peninsula Center Mall in Soldotna. To finance this project, the partnership borrowed $3 million from the Alaska Industrial Development Authority (AIDA). AIDA made this loan pursuant to a loan agreement (Loan Agreement) setting forth the general terms of 4M 2B's obligation, a promissory note (1983 Note) stating the interest rate and monthly payments on the loan, and a deed of trust and security agreement providing the shopping center as security for the debt.

AIDA raised the money that it loaned to 4M 2B by issuing a $3 million tax-free revenue bond (1983 Bond). The repayment terms of the 1983 Bond were identical to those of the 1983 Note. Payments on the bond, however, were limited to the loan payments made to AIDA by 4M 2B. AIDA sold the bond to First National and, under a trust indenture (Indenture), also appointed First National trustee of the bond. To provide First National with security for the bond, AIDA transferred its interest in 4M 2B's promissory note and deed of trust to First National. In addition, the individual partners in 4M 2B personally guaranteed the bond debt.

In 1985 the Bradfords and another couple, James C. Benson and Sandra K. Benson, withdrew from the 4M 2B partnership. Under an agreement with the continuing partners (Assumption Agreement), the Bradfords relinquished "their entire interest in the partnership" in consideration of the "distribution to them by the partnership of certain real property." The continuing partners agreed to "assume and . . . satisfy all debts and liabilities of the old partnership" and promised to "indemnify and hold the Retiring Partners harmless from all such debts and liabilities." 4M 2B notified First National of this change in the partnership on July 1, 1985, enclosing a copy of the withdrawal agreement.

In 1986, 4M 2B signed a modification agreement that lowered the interest rate and monthly payments that it was required to make on the loan made to it by AIDA. The continuing partners of 4M 2B signed this modification agreement, but the Bradfords and the Bensons did not. To account for the modified loan repayment terms, AIDA, First National, and 4M 2B agreed to modify the Indenture. Pursuant to the modified Indenture, AIDA cancelled and replaced the 1983 Bond with a "revenue refunding bond" (1986 Bond). The terms of the 1986 Bond reflected the 1986 modification of the interest rate and repayment terms of the loan.

In August 1989 AIDA and First National again agreed with 4M 2B to refinance the loan. The continuing partners in 4M 2B signed a new promissory note (1989 Note), and AIDA issued another revenue refunding bond (1989 Bond) to cancel and replace the 1986 Bond. As part of this refinancing, 4M 2B provided additional real property as security for the new note.

In 1992, four more partners in 4M 2B retired. At the same time, one new partner joined the three remaining partners to continue the partnership.

4M 2B stopped making payments on the loan in February 1994, and in May 1994, First National sent a notice of default to 4M 2B, the three original continuing partners, and the four partners who retired in 1992. The notice declared the outstanding principal and interest to be immediately due and payable and warned that First National would take "steps . . . to enforce the personal liability of the borrower and partners of the borrower and to protect and enforce the interests in property securing payment of the note." On June 13, 1994, First National brought suit against 4M 2B and each past and present partner. First National also joined other defendants with claims against the real property securing the promissory note. In the suit, First National sought judgment for the entire amount of the debt, enforcement of its right in the property securing the loan, and recovery of certain costs.

On September 28, 1994, 4M 2B filed for bankruptcy protection, and on January 9, 1995, three of the four continuing partners and all of the partners who retired in 1992 also filed petitions for bankruptcy. First National moved for summary judgment

against the Bradfords, the Bensons, and the one continuing partner who had not filed for bankruptcy. The superior court granted this motion on March 19, 1995. First National then moved for entry of final judgment against the Bradfords and the Bensons under Civil Rule 54(b). After first denying this motion, the court reconsidered and granted the motion, entering judgment against the Bradfords and the Bensons on July 31, 1995.[1]

The court limited execution on the judgment to the amount by which the outstanding balance of the judgment exceeded $1.4 million, the estimated maximum value of the real property securing the loan. The court later adjusted the judgment to reflect the bankruptcy court's conclusion that the value of the real property was only $1,244,578.59.

First National then moved for an award of $95,900 in attorney's fees that it incurred in obtaining judgment against the Bradfords and Bensons and for the relief it secured in bankruptcy court. The superior court awarded First National $35,715 in attorney's fees, the amount attributable to the proceedings in superior court leading to the final judgment.

The Bradfords appeal the superior court's grant of First National's motion for summary judgment and entry of final judgment. First National cross-appeals the superior court's decision to award only a portion of the attorney's fees it requested.

## III. DISCUSSION

### A. The Bradfords Are Liable as Sureties for 4M 2B's Debt to AIDA.

1. The Bradfords became sureties when they withdrew from 4M 2B.

 To resolve the question of the Bradfords' liability for the debt to First Na-

tional, we focus on the Loan Agreement, on the promissory note between 4M 2B and AIDA, and on the agreement the Bradfords made when they withdrew from the partnership.[2] We conclude from these documents that upon their withdrawal from 4M 2B, the Bradfords became sureties with respect to the partnership's debt. We base this conclusion on the rule that "[t]he suretyship relation is created where the surety[,] ... having been one of several principal obligors, one or more of the other co-principals contracts to assume the entire duty of performance." Restatement of Security § 83(d) (1941). The Restatement's comment on this clause addresses the precise issue before us:

> Two persons, after binding themselves as principals, may subsequently change their relations so that between themselves one has the entire duty of performance, that is, so far as they are concerned, they have become principal and surety. A common situation to which the rule stated in this Clause applies is where a partner retires and the old partners assume all the firm obligations. The retiring partner is a surety in respect of the others.

Id. § 83 cmt. f.[3] A creditor is bound by the suretyship relationship created in this way when it receives notice of the assumption agreement between the continuing and retiring partners. Id. § 114 cmt. f.

We applied this rule in State v. McKinnon, 667 P.2d 1239, 1241–42 & n. 4 (Alaska 1983). In that case, two half-brothers entered into a partnership and took out a loan from the State of Alaska. Id. at 1240–41. When the men dissolved the partnership, they signed a termination agreement providing that the partner continuing the business "agreed to

---

1. The final continuing partner filed for bankruptcy before the court granted First National's motion for entry of final judgment.

2. The agreements setting forth the terms of the loan and the partnership form the undisputed basis for deciding this case. The interpretation of contracts is a matter of law which we review de novo. Neal & Co. v. Association of Village Council Presidents Regional Hous. Auth., 895 P.2d 497, 502 (Alaska 1995).

3. See also 2 Alan R. Bromberg and Larry E. Ribstein, Partnership § 7.14(d), at 7:154 (1996)

(hereinafter Partnership ) ("[T]he assuming partners become principal debtors, and the outgoing partner becomes a surety."); Restatement of Suretyship and Guaranty § 2 (1995) ("The secondary obligation may be created ... by contract between an obligor and another person pursuant to which, without a novation, the other person assumes a duty of the obligor to the obligee, with the result that the other person becomes the principal obligor and the original obligor becomes the secondary obligor....").

assume the obligation of repaying the loan...." *Id.* at 1242. They notified the State of this agreement. *Id.* at 1241. We held that the agreement and the notice of the agreement to the creditor changed the withdrawing partner's status from co-obligor to surety. *Id.* at 1242.

When the Bradfords withdrew from 4M 2B in 1985, the continuing partners agreed to "assume and ... satisfy all debts and liabilities of the old partnership" and to "indemnify and hold the Retiring Partners harmless from all such debts and liabilities." 4M 2B notified First National of this agreement.[4] Thus, in light of *McKinnon* and general surety law, we hold that the Bradfords became sureties for 4M 2B's debt upon their withdrawal from the partnership.

The Bradfords argue that they did not "agree to become ... sureties for the remaining 4M 2B partners' obligation." They assert that, under *McKinnon*, such an agreement on their part is necessary for the creation of suretyship status. This assertion is not correct. While we noted in *McKinnon* that the withdrawing partner agreed to remain personally liable for the debt and that the change in status from co-obligor to surety was "consistent with the intent of the parties," we did not state that such agreement or intent is required to create suretyship status. 667 P.2d at 1242. Indeed, partnership law imposes liability for existing partnership debts on withdrawing partners whether or not they agree to remain personally liable. AS 32.05.310(a). The Assumption Agreement impliedly recognizes this basic rule by providing that the continuing partners will indemnify the Bradfords against their continuing personal liability.

### 2. *The Bradfords' liability as sureties was not discharged.*

■ The Bradfords concede that First National did not expressly agree to release them from liability for 4M 2B's note. Instead, they argue that First National impli-

edly discharged them under AS 32.05.310(b). This section provides:

> (b) A partner is discharged from an existing liability upon dissolution of the partnership by an agreement to that effect between the partner, the partnership creditor and the person or partnership continuing the business. The agreement may be inferred from the course of dealing between the creditor who has knowledge of the dissolution and the person or partnership continuing the business.

The Bradfords argue that First National's failure to notify them of the modifications to the promissory note, to require them to approve those modifications, and to provide them with notice of default supports the inference that First National intended to discharge them. We disagree.

■ As sureties, the Bradfords ceased to be the principal obligors, but they remained liable for the loan upon default. *McKinnon*, 667 P.2d at 1244. First National had no right of recourse against the Bradfords until the partnership defaulted. *Id.*; 2 *Partnership*, *supra* n. 3, § 7.14(d), at 7:155. It thus had no obligation or reason to notify them of or secure their approval for the modifications to the loan, nor did it have a duty to give them notice of default. *See McKinnon*, 667 P.2d at 1241, 1244; *Restatement of Security* § 136 (stating that "the surety's obligation to the creditor is not affected by the creditor's failure to notify him of the principal's default unless such notification is required by the terms of the surety's contract"). First National's course of dealing exclusively with the continuing partners was entirely consistent with the Bradfords' surety status. Therefore, we hold that First National's course of dealing under these circumstances could not as a matter of law support an inference that it intended to discharge the Bradfords.

■ This conclusion is supported by AS 32.05.310(c). That subsection provides:

---

4. In a letter to First National, 4M 2B stated that the "Bradford's [sic] have retired from the 4M 2B Partnership." 4M 2B attached to the letter a copy of the agreement by the remaining partners to assume the debts of the partnership.

(c) Where a person agrees to assume the existing obligations of a dissolved partnership, the partners whose obligations have been assumed are discharged from liability to a creditor of the partnership who, knowing of the agreement, consents to a material alteration in the nature or time of payment of the obligations.

It is this subsection that expressly provides for discharge of a surety. Under this subsection, a surety is discharged only when the creditor "consents to a material alteration in the nature or time of payment of the obligations." AS 32.05.310(c). By implication then, a surety is not discharged when the creditor consents to nonmaterial alterations in the nature or time of payment, regardless of whether the surety has notice or approves of the alteration. The Bradfords acknowledge that subsection (c) does not release them from liability in this case. Thus, they apparently agree that First National's agreement to lower the interest rate and monthly payment on 4M 2B's loan was not the kind of modification of the partnership's obligation that would discharge them. Accepting the Bradfords' argument would therefore require the conclusion that the same course of dealing that specifically does not discharge the Bradfords under subsection (c) does discharge them under subsection (b). Such an interpretation would violate the general rule that this court "interprets each part or section of a statute with every other part or section, so as to create a harmonious whole." *Rydwell v. Anchorage Sch. Dist.*, 864 P.2d 526, 528 (Alaska 1993).

The Bradfords rely on cases in which they claim courts found an implied discharge under the section of the Uniform Partnership Act codified at subsection (b). These cases, however, are easily distinguishable because they do not specifically discuss the issue of discharge of a surety. *See Wester & Co. v. Nestle*, 669 P.2d 1046, 1047–48 (Colo.App. 1983); *Victoria Air Conditioning, Inc. v.*

*Southwest Texas Mechanical Insulation Co.*, 850 S.W.2d 720, 724 (Tex.App.1993).[5]

### 3. *The Bradfords were not discharged under the doctrine of implied waiver.*

The Bradfords also argue, relying on the same course of dealing described above, that First National impliedly waived its claim for 4M 2B's debt against them. This court recently reiterated the doctrine of implied waiver in *Airoulofski v. State*, 922 P.2d 889, 894–95 (Alaska 1996):

An implied waiver arises where the course of conduct pursued evidences an intention to waive a right, or is inconsistent with any other intention than a waiver, or where neglect to insist upon the right results in prejudice to another party. To prove an implied waiver of a legal right, there must be direct, unequivocal conduct indicating a purpose to abandon or waive the legal right, or acts amounting to an estoppel by the party whose conduct is to be construed as a waiver.

*Id.* at 894 (quoting *Milne v. Anderson*, 576 P.2d 109, 112 (Alaska 1978)) (citations omitted).

The argument based on implied waiver fails for the same reason as the argument under AS 32.05.310(b). As discussed above, First National was bound after notice of the assumption agreement to treat the Bradfords as sureties rather than as principal obligors. Far from the "direct, unequivocal conduct indicating a purpose to abandon" required under the doctrine, First National's actions were entirely consistent with an intent to hold the Bradfords liable as sureties for 4M 2B's debt. Therefore, we hold that the trial court did not err in granting First National's motion for summary judgment and ruling that the Bradfords are liable for 4M 2B's debt under the Loan Agreement.[6]

---

**5.** Since the continuing partner in *Nestle* agreed with the retiring partner to assume the partnership obligations, that case did involve discharge of a surety. 669 P.2d at 1047–48. The court, however, never considered the issue of the withdrawing partner's suretyship status.

**6.** Because we hold that the Bradfords are liable for the debt to First National under the Loan Agreement, we do not need to consider whether they are also liable under the Guaranty Agreement.

B. *The Superior Court Did Not Err in Entering Final Judgment against the Bradfords under Civil Rule 54(b).*[7]

 The Bradfords argue that even if the trial court properly granted First National's motion for summary judgment, it erred in entering final judgment against them under Civil Rule 54(b). They seek to delay the entry of final judgment against 4M 2B and the partners now in bankruptcy court.

Rule 54(b) provides that "when multiple parties are involved [in an action], the court may direct the entry of a final judgment as to one or more but fewer than all of the ... parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment."

 The Bradfords first argue that, while First National "might suffer a delay in collecting on its judgment" because the proceedings against the primary obligors are stayed by the bankruptcy proceedings, the potential delay "is not the sort of hardship which justifies" entry of final judgment under Rule 54(b). This assertion is contrary to our decisions discussing Rule 54(b). In *Williams*, 890 P.2d at 587, we held specifically that a court could "properly consider" the delay resulting from bankruptcy proceedings in deciding whether to enter a Rule 54(b) judgment. Furthermore, First National was entitled to repayment of the balance of the loan at the time 4M 2B defaulted on it; to force it to wait indefinitely to enforce its right to collect the debt would be to impose exactly the type of hardship Rule 54(b) was designed to avoid. *See S & B Mining Co. v. Northern Commercial Co.*, 813 P.2d 264, 269 (Alaska 1991) (holding delay in collecting debt sufficient hardship to justify entry of final judgment under Rule 54(b)).

 The Bradfords also contend that they should not be held liable as secondary obligors when First National may still collect from the principal debtors. First National, however, was entitled to judgment against the Bradfords as sureties as soon as the principal obligors defaulted. *State v.*

*McKinnon*, 667 P.2d 1239, 1244 (Alaska 1983). We hold, therefore, that the trial court was within its discretion in granting First National's motion for entry of final judgment under Rule 54(b).

C. *The Superior Court Erred in Not Awarding First National the Full Amount of Its Requested Attorney's Fees.*

First National cross-appeals the trial court's decision to limit its attorney's fees award to the $35,715 "directly attributable to this action." The court excluded $60,185 in attorney's fees attributable to the proceedings in bankruptcy court and to establishing the validity and priority of First National's interest in the property securing the loan. First National argues that under the Loan Agreement the Bradfords undertook to pay all of its reasonable fees regardless of whether they were incurred in bankruptcy court, in securing collateral, or in pursuing its claims against other defendants. The Bradfords argue that they should not be liable for attorney's fees incurred in proceedings where they were not parties.

 First National bases its claim for attorney's fees solely on contractual provisions, as allowed by Civil Rule 82(a).[8] *See Gudenau v. Bierria*, 868 P.2d 907, 912–13 (Alaska 1994) (concluding that in fixing size of attorney's fee, superior court correctly followed terms of contract providing for reasonable attorney's fees rather than Rule 82). Contractual liability for attorney's fees, as opposed to statutory liability, is a lightly litigated area. *See* 2 Stuart M. Speiser, *Attorneys' Fees* § 15.19, at 318–19 (1973) ("The answer to the question what persons may be held liable on contractual provisions for payment of attorneys' fees generally seems fairly obvious; and, for that reason, the issue usually is not even discussed in the cases."). Because we find no authority addressing the precise issue before us, we look for guidance to the specific undertaking set forth by the provisions of the Loan Agreement and to the

7. We review an entry of judgment under Rule 54(b) for abuse of discretion. *Williams v. Mammoth of Alaska, Inc.*, 890 P.2d 581, 586 (Alaska 1995).

8. Rule 82(a) states that attorney's fees may be provided as "agreed to by the parties...."

statutes governing the liability of partners for partnership debts.[9]

■ The Loan Agreement provides that, in case of default, 4M 2B shall pay, in addition to principal and interest,

> such further amount as shall be sufficient to cover the reasonable costs and expenses of collection, including a reasonable compensation to the Trustee, its agents, attorney and counsel, and any expenses or liabilities incurred by the Issuer or the Trustee other than through its negligence or bad faith.
>
> . . . .
>
> In case the Borrower shall fail forthwith to pay such amounts upon demand, the Trustee shall be entitled and empowered to institute any actions or proceedings at law or in equity for the collection of the sums so due and unpaid, and may prosecute any such action or proceeding to judgment or final decree, and may enforce any such judgment or final decree against the Borrower and collect in the manner provided by law out of the property of the Borrower the moneys adjudged or decreed to be payable.

These are broad provisions, and the Bradfords do not dispute that they cover the attorney's fees sought by First National in this case. The Bradfords, however, argue that the fees are "a partnership obligation" and that, because the Loan Agreement does not "unambiguously impose liability" upon them under the facts of this case, they should not be held liable. This argument is contrary to the general rule.

■ Under partnership law, "[a]ll partners are liable jointly for ... debts and obligations of the partnership." AS 32.05.100.[10] Once joint liability is imposed, "each partner is considered liable for the full amount of the contract." 2 *Partnership, supra* n. 3, § 5.10(b), at 5:71–72 (citing *Midwood Development Corp. v. K 12th Associates,* 146 A.D.2d 754, 537 N.Y.S.2d 237, 239 (App.Div.1989)).[11] Contrary to the Bradfords' argument, partners are liable for partnership obligations unless the agreement at issue specifically relieves them of liability. We hold, therefore, that the Bradfords are liable for the partnership's obligation to pay First National's reasonable attorney's fees under the terms of the Loan Agreement.[12]

This conclusion is supported by relevant precedent from this court. In *City of Kenai v. McLane,* 821 P.2d 717, 719 (Alaska 1991), we determined that an agreement signed by all of the partners of a partnership in their individual capacity imposed personal liability upon each partner. Furthermore, "see[ing] no indication that the parties contracted for limited liability," we refused to "read such a limitation into their agreement." *Id.* at 720 (citing *Moening v. Alaska Mut. Bank,* 751 P.2d 5, 9 (Alaska 1988)).

■ In signing the Loan Agreement, the Bradfords, along with the other partners, undertook to pay the reasonable attorney's fees First National would incur in collecting the debt should 4M 2B default. Their promise as partners was part of the bargain inducing First National to make the loan. When the Bradfords withdrew from the partnership, they gave up their voice in 4M 2B voluntarily and in exchange for consideration. Just as that decision to withdraw did not relieve their liability for 4M 2B's debt, neither did it discharge their other obligations as former partners. Absent a substitute con-

---

9. We review the trial court's interpretation of these contractual provisions and statutes *de novo. Neal & Co. v. Association of Council Presidents Regional Hous. Auth.,* 895 P.2d 497, 502 (Alaska 1995).

10. Courts have held that to enforce this joint liability (as opposed to joint and several liability), the creditor must bring suit against all the partners generally. 2 *Partnership, supra* n. 3, § 5.10(b), at 5:71. The Bradfords do not argue that First National has failed to do this.

11. This liability is also limited by a rule, not explicit in the Uniform Partnership Act, but frequently applied by courts, that creditors first exhaust the partnership assets. 2 *Partnership, supra* n. 3, § 5.08(e), at 5:59–62. The Bradfords make no argument that First National has failed to do this.

12. Because we decide that the Bradfords are liable for the attorney's fees at issue under the Loan Agreement, we do not address whether they are also liable under the Guaranty Agreement.

tract in which all the parties agree to discharge the Bradfords, they remain liable for First National's reasonable attorney's fees as provided in the Loan Agreement.[13] *See Restatement (Second) of Contracts* § 279(1) (1979) ("A substituted contract is a contract that is itself accepted by the obligee in satisfaction of the obligor's existing duty.").

## IV. *CONCLUSION*

For the reasons above, we AFFIRM the superior court's grant of First National's motion for summary judgment and entry of final judgment against the Bradfords. We RE-VERSE the superior court's award of attorney's fees and REMAND to the superior court for award of the entire amount of the attorney's fees requested by First National.

MATTHEWS, J., not participating.

**13.** The Bradfords also argue that since First National did not sue them for breach of the Loan Agreement, "it cannot now avail itself of the terms of that agreement." Since the Bradfords failed to raise this issue in the court below, we decline to review it on appeal. *Tommy's Elbow Room, Inc. v. Kavorkian,* 754 P.2d 243, 245 n. 7 (Alaska 1988).