ST. PAUL CHURCH, INC., an Alaska Corporation, Pat Turner, Chris Case, Thomas J. Hallinan, Robert F. Carlson, and Cam Carlson, Appellants/Cross–Appellees,

v.

BOARD OF TRUSTEES OF the ALASKA MISSIONARY CONFERENCE OF the UNITED METHODIST CHURCH, INC., Appellee/Cross–Appellant.

Nos. S–11641, S–11661.

Supreme Court of Alaska.

Oct. 13, 2006.

---

John J. Burns and Corinne M. Vorenkamp, Borgeson & Burns, PC, Fairbanks, for Appellants and Cross–Appellees.

Thomas H. Dahl and Joseph W. Sheehan, Law Offices of Joseph W. Sheehan, Fairbanks, for Appellee and Cross–Appellant.

Before: BRYNER, Chief Justice, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

St. Paul Church, Inc., formerly a local affiliate of The United Methodist Church, was discontinued as a United Methodist Church by the Alaska Missionary Conference of The United Methodist Church. Following the discontinuance, a dispute arose between St. Paul Church and the Alaska Missionary Conference over two parcels of property that St. Paul Church acquired when it was affiliated with The United Methodist Church. Applying an approach that relied on neutral principles of law to this issue of first impression in Alaska—how property disputes should be resolved following a schism between religious groups—the superior court determined that the Alaska Missionary Conference was entitled to possession of the disputed properties. St. Paul Church appeals. Because we agree with both the neutral-principles approach adopted by the superior court and the result it reached, we affirm. We also affirm the superior court's determination that the individually named appellants are liable for trespass and conversion with respect to the property properly awarded to the Alaska Missionary Conference. The Alaska Missionary Conference cross-appeals, seeking reversal of the superior court's determination that St. Paul Church, and not the Alaska Missionary Conference, is entitled to the St. Paul corporate entity and the name St. Paul Church. Because we agree with the superi-

or court that St. Paul Church is entitled to retain its independent corporate existence and name, we affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts

#### 1. The United Methodist Church, Alaska Missionary Conference, and The Book of Discipline

The United Methodist Church (UMC) is a worldwide religious denomination organized by conferences, "each covering a wider geographic scope, beginning with the local church and charge conference and extending through the district, annual, jurisdictional (regional), and [g]eneral [c]onferences." The Board of Trustees of the Alaska Missionary Conference of the UMC (AMC) is an Alaska nonprofit corporation and is the regional conference of UMC that represents Alaska.

The Book of Discipline "is the book of law of The United Methodist Church."[1] The Discipline sets forth the organizational structure of UMC[2] and contains a chapter devoted to church property.[3] According to the Discipline:

> The United Methodist Church is organized as a *connectional structure*, and titles to all real and personal, tangible and intangible property held at general, jurisdictional, annual, or district conference levels, or by a local church or charge, or by an agency or institution of the Church, shall be held in trust for The United Methodist Church and subject to the provisions of its Discipline.[4]

Paragraph 2503 of the Discipline sets forth trust language which all written instruments conveying real property for purposes of worship or as parsonages "shall contain," to the effect that all property is being held in trust for UMC.[5] The Discipline later provides:

> [T]he absence of a trust clause ... in deeds and conveyances executed previous-

---

1. Book of Discipline of the United Methodist Church (Harriet Jane Olson et al. eds., 2000).

2. *Id.* at 23–35, ¶¶ 7–43.

3. *Id.*, ch. 6.

4. *Id.* at 649, ¶ 2501.

5. *Id.* at 649–50, ¶ 2503(2)-(3).

ly or in the future shall in no way exclude a local church or church agency, or the board of trustees of either, from or relieve it of its connectional responsibilities to The United Methodist Church. Nor shall it absolve a local church or church agency or the board of trustees of either, of its responsibility and accountability to The United Methodist Church, including the responsibility to hold all of its property in trust for The United Methodist Church; *provided* that the intent of the founders and/or a later local church or church agency, or the board of trustees of either, is shown by any or all of the following:

a) the conveyance of the property to a local church or church agency (or the board of trustees of either) of The United Methodist Church or any predecessor to The United Methodist Church;

b) the use of the name, customs, and polity of The United Methodist Church or any predecessor to The United Methodist Church in such a way as to be thus known to the community as a part of such denomination; or

c) the acceptance of the pastorate of ordained ministers appointed by a bishop or employed by the superintendent of the district or annual conference of The United Methodist Church or any predecessor to The United Methodist Church.[6]

Paragraph 2506 of the Discipline notes that these property provisions are subordinate to local law:

All provisions of the Discipline relating to property, both real and personal, and relating to the formation and operation of any corporation, and relating to mergers are conditioned upon their being in conformity with the local laws, and in the event of conflict therewith the local laws shall prevail; *provided,* however, that this requirement shall not be construed to give the consent of The United Methodist Church to deprivation of its property without due process of law or to the regulation

of its affairs by state statute where such regulation violates the constitutional guarantee of freedom of religion and separation of church and state or violates the right of the Church to maintain connectional structure. . . . [7]

The Discipline contemplates discontinuation of a local church and provides for property disposition in the wake of a discontinuance:

A recommendation of discontinuance shall include recommendations as to the future use of the property and where the membership . . . and the title to all the real and personal, tangible and intangible property of the local church shall be transferred. On such recommendation that a local church no longer serves the purpose for which it was organized and incorporated . . ., with the consent of the presiding bishop and a majority of the district superintendents and the district board of church location and building of the district in which the action is contemplated, the annual conference may declare any local church within its bounds discontinued.[8]

It further provides:

[W]hen a local church no longer serves the purpose for which it was organized and incorporated . . ., with the consent of the presiding bishop, a majority of the district superintendents, and of the district board of church location and building, the annual conference trustees may assume control of the real and personal, tangible and intangible property. . . . The conference trustees may proceed to sell or lease said property, retain the proceeds in an interest-bearing account, and recommend the disposition of the proceeds in keeping with annual conference policy. It shall be the duty of the annual conference trustees to remove, insofar as reasonably possible, all Christian and church insignia and symbols from such property.[9]

---

6. *Id.* at 651, ¶ 2503(6).

7. *Id.* at 652, ¶ 2506.

8. *Id.* at 680, ¶ 2548(2).

9. *Id.* at 680–81, ¶ 2548(3).

### 2. St. Paul Church, Inc. and the individually named appellants

In 1983 a group of families in the Fairbanks area contacted AMC, expressing interest in forming a new UMC congregation. In a letter dated February 21, 1984 to Larry Bennett, one of the early members of St. Paul Church, Bishop Calvin D. McConnell informed Bennett:

All property of United Methodist Churches is owned in trust on behalf of The United Methodist Church. There is no such thing as locally owned property. When a congregation votes to purchase real estate and to build a building on it, they obligate themselves with the financial responsibilities of such purchase and construction and continuing maintenance. But they do so as part of the connection of all United Methodists. Property is held on behalf of the denomination as a whole for its strategically missional purposes. When a new forming religious community agrees to become a United Methodist Church they agree to its constitution, Articles of Religion, and its polity and governance. Part of its polity and governance involves property being held in trust on behalf of The United Methodist Church.

And also:

I go into all of this to indicate that we are a connectional church. The local church is tied together with others for the mutual benefit of one another in mission to the world. Property is held in common by the denomination, with each local church assuming the responsibilities and enjoyment of using its own property, maintaining it, developing it, and improving it. If a congregation, or a portion of it, should at any point in its history decide to separate from The United Methodist Church, it could certainly do so, but could not take the title of the property with them. The property is held by the denomination to assure the means of providing continuing ministry on behalf of The United Methodist Church in that location.

Bishop McConnell also referred Bennett to the paragraphs of the Discipline relating to property ownership, and he quoted with emphasis from Paragraph 2501:

The United Methodist Church is organized as a *connectional structure,* and titles to all properties held at General, Jurisdictional, Annual, or District Conference Levels, *or by a local church or charge,* or by an agency or institution of the church, shall be held in trust for The United Methodist Church and subject to the provisions of its DISCIPLINE.

The letter then noted:

Incidentally, there have been some rather unfortunate civil suits against denominations such as United Methodist and Presbyterian to challenge this concept of property being held in trust. In every case the civil courts have upheld the denomination.

I do not go into such long detail about this matter to intimidate you or discourage you, but only to inform you. It would seem important to me that your developing congregation understand the implications of the connectional nature of this undertaking in establishing a new local church. It is something that is being done together. *Your group needs to be sure that it really wants to be United Methodist.* If so, there are certain understandings which are inherent within it … [including] holding property in trust on behalf of the denomination.

From January 1984 through April 1984, members of the St. Paul Church community signed a "Statement of Intent" which declared that they were intending to present themselves for membership in UMC and that they would worship and conduct business "in accordance with The Book of Discipline of The United Methodist Church." On April 15, 1984, St. Paul was granted a Certificate of Organization by AMC, stating that it had been duly constituted according to the provisions of the Discipline of UMC. Parties to this litigation, Robert Carlson, Cam Carlson, and Thomas Hallinan, signed the Statement of Intent.

St. Paul Church was incorporated as a religious corporation on November 23, 1984 under the name St. Paul United Methodist Church. The stated purposes of the corporation were

to promote Christian religion, conduct public worship, conduct religious education, perform acts of charity, acquire, hold or dispose of church property and funds and perform such other lawful acts as may be necessary from time to time, subject to the Discipline of The United Methodist Church and ultimately subject to the word of God as found in the Old and New Testaments of the Bible.

To receive and maintain a fund or funds of real or personal property or both and, subject to the restrictions and limitations hereinafter set forth, to use and apply the whole or any part of its income therefrom and the principle thereof exclusively for religious, charitable or educational purposes of the corporation directly. . . .

The Articles of Incorporation further provided:

Upon dissolution of the corporation, or upon the conclusion of its affairs, the assets of the corporation shall be distributed to such religious, charitable, or education organization(s) as the Board of Trustees may select, which are carrying on functions consistent with the purpose of this corporation. . . .

Under the Articles, the Board of Trustees "shall be in charge of all property of the Church and of the act of incorporating the Church." The Articles were signed by Robert F. Carlson, Trustee in Trust as Chairman of the Board of Trustees.

In 1988 St. Paul Church purchased two pieces of property, a parsonage and land upon which it later built a church. Title to both properties was in the name of St. Paul United Methodist Church. Neither of the deeds contained the trust language set forth in Paragraph 2503 of the Discipline. St. Paul annually informed AMC of its failure to include the trust language in the deeds when it submitted its annual reports to the trustees of AMC, and answered "no" to the question whether each deed contained a trust clause.

In November 1986 a letter was sent to St. Paul from the General Board of Global Ministries of the UMC (GBGM) informing that, pursuant to its application for a grant to assist with a land purchase, the GBGM had approved a $25,000 grant to St. Paul on the condition that a Trust Agreement and Mortgage be recorded against the local church as security for the donation of mission funds. The letter stated that "[t]he National Division, in granting a conditional donation to a church, requires that a lien be placed upon the property for the return of the monies in the event that the property should be ever sold, alienated from The United Methodist Church, or cease to be used for church purposes." The Trust Agreement and Mortgage was signed on November 9, 1990.

The introductory clauses of the Trust Agreement and Mortgage provide in relevant part:

Whereas the party of the first part does hereby represent and declare that it has acquired title to, and does now hold, the premises hereinafter described, and that said premises shall be held, kept, and maintained as a place of residence for the use and occupancy of the ministers of The United Methodist Church, who may from time to time be entitled to occupy the same by appointment, and/or[ ] used, kept and maintained, as a place of divine worship of the United Methodist ministry and members of The United Methodist Church; subject to the Discipline, usage, and ministerial appointments of said church as from time to time authorized and declared by the General Conference of said church, and the Annual Conference within whose bounds the said premises are situated[.]

The agreement later states:

[I]n case [St. Paul] shall cease to be connected with The United Methodist Church, or its successor, or the corporate existence of [St. Paul] shall cease, or the property hereinafter described shall ever hereafter be alienated from The United Methodist Church, or cease to be used for or be devoted to other uses and purposes than the uses [or] purposes set forth herein, then, [St. Paul] shall and will forthwith repay to the party of the second part, the successors or assigns thereof, the said amount with lawful interest thereon, from the date of the aforesaid alienation, dissolution or abandonment.

### 3. The discontinuation

Following a period of conflict between members of the lay congregation of St. Paul and the regional administration of UMC, on December 8, 2001, Reverend Rachel Lieder Simeon, on behalf of the Cabinet of AMC, informed Reverend Don Strait, then interim pastor at St. Paul, and Judy Stoop, the chairperson of the Staff Parish Relations Committee, that it was the recommendation of the Cabinet of AMC that St. Paul acknowledge the need for new lay leadership. The communication informed Strait and Stoop that a formal request was being made that the lay leadership of St. Paul step aside in order to facilitate the development of new leadership. It was further recommended that the new leadership stay in office for no less than three years.

On January 22, 2002, a meeting was held at St. Paul, and lay leaders were elected in a manner contrary to the wishes of AMC. Subsequently, in February 2002 Lieder Simeon recommended to AMC's Administrative Unit that UMC cease its affiliation with St. Paul.

On May 22, 2002, St. Paul filed a verified complaint for a temporary restraining order, a preliminary injunction, and a permanent injunction asking the superior court to enjoin a vote on the discontinuation because AMC was not following the proper discontinuation procedure under the Discipline. The superior court, finding that the lawsuit concerned "the internal workings of The United Methodist Church" and that the court had no jurisdiction to determine the question, granted AMC's motion to dismiss the complaint.

At the Annual Meeting of AMC on May 30, 2002, St. Paul was discontinued. According to the minutes, at the outset of the meeting, Bishop Paup "reminded all that 'we are not owners—we are custodians.' " Lieder Simeon also informed the conference:

It is important to realize that we are not making a determination as to whether or not St. Paul should exist as a church. The only determination we make, as an annual conference of The United Methodist Church, is whether or not St. Paul should be continued as a United Methodist Church.

The vote for discontinuance was recorded as sixty-one for discontinuance and one against discontinuance, with Robert Carlson the only person voting against discontinuance.

With respect to disposition of property, the minutes read:

Superintendent Rachel Lieder Simeon reminded the conference that all local church property is held in trust for the denomination. Whenever a church ceases to exist as a United Methodist entity, all the property and assets revert to the denomination.

Recommendation concerning the disposition of property:

The Administrative Unit of the Alaska Missionary Conference recommends that the Alaska Missionary Conference retain the title and asset[s] of the current parsonage and make the church property available to an appropriate body for continuation as a church on that site. Further, we recommend that the Board of Trustees of the Alaska Missionary Conference be empowered by the annual conference to negotiate the terms of the transfer of deed and property. If agreement cannot be reached between the parties, the trustees shall be empowered to work out another arrangement.

Recommendation supported.

The following recommendation was also made concerning the disposition of the membership:

The cabinet recommends that the superintendent who has been in charge of St. Paul UMC contact the current membership within one month of the vote by the Annual Conference to attempt to meet with the membership and work with those who desire assistance in finding a new church home.

A few days after St. Paul was discontinued, Rachel Lieder Simeon accompanied a team to Fairbanks, "entered the church building and removed all books and other items that contained the identification, through word or symbol, of The United Methodist Church." The team also removed the UMC symbol from the sign, removed office equipment, changed the locks on the church building and the parsonage, and withdrew the balance

from St. Paul's bank account. The team also affixed "No Trespassing" signs to the church.

On June 6, 2002, after the discontinuation, St. Paul amended its Articles of Incorporation, deleting all references to UMC, changing its name to St. Paul Church, and changing its status from a religious corporation to a nonprofit corporation. In mid-July 2002 St. Paul concededly "regained control of its parsonage and church buildings, and resumed regular worship in the church."

## B. Proceedings

On September 27, 2002, AMC filed a complaint against St. Paul United Methodist Church, Inc., Pat Turner, Gary Koll,[10] Chris Case, Thomas Hallinan, Robert Carlson, Cam Carlson (the individually named appellants), and several John Doe members of the congregation for forcible entry and detainer, breach of contract, trespass, quiet title, and ejectment and sought declaratory relief. On October 23, 2002, AMC filed an amended complaint which added a claim for breach of fiduciary duty. St. Paul asserted the affirmative defenses of lack of subject matter jurisdiction, statute of limitations, estoppel, laches, failure of consideration, waiver, and statute of frauds. St. Paul also included within its answer to the amended complaint a counterclaim for theft based on AMC's removal of personal property from the church and the withdrawal of $6,000 from St. Paul's bank account.

On June 9, 2003, AMC moved for partial summary judgment, arguing that it was entitled to judgment as a matter of law for breach of contract, breach of fiduciary duty on the part of the individually named appellants, ejectment, and quiet title. On April 5, 2004, St. Paul and the individually named appellants moved for summary judgment on all claims brought against them.

On April 2, 2004, AMC moved to dismiss the answer and the counterclaims of the individually named appellants for lack of standing. The superior court denied the motion on the ground that the only counterclaim asserted in the responsive pleading of the defendants was brought on behalf of St. Paul and not on behalf of the individually named appellants. Therefore, it was irrelevant if the individually named appellants had standing to bring a claim.

On June 24, 2004, the superior court entered a judgment of liability in favor of the Board of Trustees of AMC and against St. Paul Church, Inc. for trespass and conversion. St. Paul Church appeals, arguing that the lower court did not apply a true neutral-principles approach for resolving church property disputes in Alaska when it found that St. Paul was "bound by the rules of The Book of Discipline," and when it disregarded basic principles of trust and property law. St. Paul further argues that the superior court erred in finding the individually named appellants liable for trespass and conversion.

On August 2, 2004, the superior court awarded St. Paul its name and corporate existence. AMC cross-appeals, arguing that it is entitled to these property rights. AMC also revives its claim that the individually named appellants should be dismissed from the lawsuit.

## III. DISCUSSION

### A. Standard of Review

 Constitutional issues present questions of law, and they are reviewed de novo.[11] The choice of the proper standard to adopt for resolving property disputes is a question of law that we review de novo,[12] adopting the "rule of law that is most persuasive in light of precedent, reason, and policy."[13] Motions to dismiss,[14] motions for summary judgment,[15]

---

**10.** Gary Koll was dismissed as a party to the litigation by stipulation on January 26, 2004.

**11.** *Alaska Legislative Council ex rel. Alaska State Legislature v. Knowles*, 86 P.3d 891, 893 (Alaska 2004).

**12.** *Rausch v. Devine*, 80 P.3d 733, 737 (Alaska 2003).

**13.** *Guin v. Ha*, 591 P.2d 1281, 1284 n. 1 (Alaska 1979).

**14.** *McElroy v. Kennedy*, 74 P.3d 903, 906 (Alaska 2003).

**15.** *K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 711 (Alaska 2003).

and issues of standing[16] are reviewed de novo. In reviewing a grant of summary judgment, we may affirm on any basis appearing in the record, so long as no new factual determinations are required.[17]

## B. We Adopt a Neutral–Principles Approach to Resolving Church Property Disputes.

### 1. United States Supreme Court precedent

In 1871 the United States Supreme Court first addressed a dispute over ownership of church property stemming from a rift between two religious factions of a local church in *Watson v. Jones.*[18] In analyzing the dispute, the Court distinguished between churches with congregational or independent organizations, governed solely within themselves, and those where a congregation was part of a larger, structured denomination.

When property disputes arose in hierarchical churches, the Court adopted an approach deferential to the hierarchy, explaining:

> [W]e think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.[19]

While courts began to make exceptions to the *Watson* deference approach for "fraud, collusion, or arbitrariness,"[20] the *Watson* approach was not substantially modified until the United States Supreme Court's decision in *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church.*[21] *Presbyterian Church* involved the withdrawal of two local churches from the Presbyterian church because the local organizations believed that certain actions of the general church were departures from the doctrine and practice in force when they became affiliated with the church.[22] The local churches denounced the jurisdiction of the general church, and an administrative commission appointed by the general church (after it failed to broker a reconciliation) acknowledged the withdrawal of the local church and took over the local churches' property.[23] The local churches did not appeal to higher church tribunals but instead filed a civil suit in the Georgia courts.[24] The Supreme Court of Georgia affirmed a jury verdict in favor of the local churches that was based on the theory that Georgia law implied a trust of local church property for the benefit of the general church on the sole condition that the general church adhere to tenets of faith existing at the time of affiliation by the local churches.[25]

The United States Supreme Court reversed, reasoning that

> the departure-from-doctrine element of the Georgia implied trust theory requires the civil court to determine matters at the very core of religion—the interpretation of particular church doctrines and the importance of those doctrines to the religion.

---

16. *Fairbanks Fire Fighters Ass'n, Local 1324 v. City of Fairbanks,* 48 P.3d 1165, 1167 (Alaska 2002).

17. *Far North Sanitation, Inc. v. Alaska Public Utils. Comm'n,* 825 P.2d 867, 869 n. 2 (Alaska 1992).

18. 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1871).

19. *Watson,* 80 U.S. at 727.

20. *See, e.g., Gonzalez v. Roman Catholic Archbishop of Manila,* 280 U.S. 1, 14, 50 S.Ct. 5, 74 L.Ed. 131 (1929).

21. 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969).

22. *Id.* at 442, 89 S.Ct. 601.

23. *Id.* at 443, 89 S.Ct. 601.

24. *Id.*

25. *Id.* at 443–44, 89 S.Ct. 601.

Plainly, the First Amendment forbids civil courts from playing such a role.[26]

■ Significantly, in reaching its decision the Supreme Court in *Presbyterian Church* laid the foundation for a competing view of the proper role of civil courts in resolving church property disputes when it found that

not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without "establishing" churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern.[27]

In a concurring opinion in *Maryland & Virginia Eldership of the Churches of God v. Church of God at Sharpsburg,* Justice Brennan elaborated on the Court's decision in *Presbyterian Church,* noting that "a State may adopt any one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or tenets of faith." [28] He noted that courts could adopt the *Watson* approach, enforcing property decisions made within a hierarchical church by the highest authority within the church that ruled on the dispute.[29] Citing *Presbyterian Church,* he noted that

[n]eutral principles of law, developed for use in all property disputes provide another means for resolving litigation over religious property. Under the "formal title" doctrine, civil courts can determine ownership by studying deeds, reverter clauses, and general state corporation laws. Again, however, general principles of property law may not be relied upon if their application requires civil courts to resolve doctrinal issues. For example, provisions in deeds or in a denomination's constitution for the reversion of local church property to the general church, if conditioned upon a finding of departure from doctrine, could not be civilly enforced.[30]

■ In *Jones v. Wolf,* the latest United States Supreme Court decision to offer guidance to state courts in resolving church property disputes, a five-to-four majority of the Court expressly declined to find that the First Amendment requires the states to adopt a rule of compulsory deference to religious authorities, and held that "a State is constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute." [31] Its discussion in *Jones* clearly suggested that while states retain the leeway to implement the deference approach of *Watson,* the neutral-principles approach is the preferred approach.

The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice. Furthermore, the neutral-principles analysis

---

26. *Id.* at 450, 89 S.Ct. 601.

27. *Id.* at 449, 89 S.Ct. 601.

28. *Maryland & Virginia Eldership of the Churches of God v. Church of God of Sharpsburg,* 396 U.S. 367, 368, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970).

29. *Id.*

30. *Id.* at 370, 90 S.Ct. 499 (quotations and citations omitted). As a third alternative, he suggested that states pass "special state statutes governing church property arrangements in a manner that precludes state interference in doctrine." *Id.* Alaska has adopted no such statutes.

31. 443 U.S. 595, 596, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979).

shares the peculiar genius of private-law systems in general—flexibility in ordering private rights and obligations to reflect the intentions of the parties.[32]

While expressing some reservations about the neutral-principles approach, the majority of the Court had sharper criticism for the *Watson* approach when addressing a dissent that would require compulsory deference.

> The dissent suggests that a rule of compulsory deference would somehow involve less entanglement of civil courts in matters of religious doctrine, practice, and administration. Under its approach, however, civil courts would always be required to examine the polity and administration of a church to determine which unit of government has ultimate control over church property. In some cases, this task would not prove to be difficult. But in others, the locus of control would be ambiguous, and "[a] careful examination of the constitutions of the general and local church, as well as other relevant documents, would be necessary to ascertain the form of governance adopted by the members of the religious association." In such cases, the suggested rule would appear to require "a searching and therefore impermissible inquiry into church polity." The neutral-principles approach, in contrast, obviates entirely the need for an analysis or examination of ecclesiastical polity or doctrine in settling church property disputes.

> The dissent also argues that a rule of compulsory deference is necessary in order to protect the free exercise rights "of those who have formed the association and submitted themselves to its authority." This argument assumes that the neutral-principles method would somehow frustrate the free-exercise rights of the members of a religious association. Nothing could be further from the truth. The neutral-principles approach cannot be said to "inhibit" the free exercise of religion, any more than do other neutral provisions of state law

governing the manner in which churches own property, hire employees, or purchase goods. Under the neutral-principles approach, the outcome of a church property dispute is not foreordained. At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church. The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form.[33]

Following *Jones*, state courts were permitted to adopt either the neutral-principles approach or the compulsory-deference approach, resulting in a split among the jurisdictions. For example, the Supreme Court of Pennsylvania in *Presbytery of Beaver-Butler of the United Presbyterian Church in the United States v. Middlesex Presbyterian Church*,[34] when considering which of the competing approaches to adopt, cited California, Georgia, Illinois, Maryland, Missouri, South Dakota, and Ohio as among those jurisdictions adopting the neutral-principles view,[35] with Florida, Iowa, Michigan, New Jersey, and West Virginia adhering to the *Watson* approach.[36]

### 2. Alaska Supreme Court precedents

While the issue of resolution of church property disputes has never come squarely before us, and is thus an issue of first impression in Alaska, we have had the opportunity to address the proper role of civil courts in evaluating disputes between churches and church employees, and have adopted an approach similar to the neutral-principles approach. In *Marshall v. Munro*, we held that while this court did not have jurisdiction over

---

**32.** *Id.* at 603, 99 S.Ct. 3020.

**33.** *Jones,* 443 U.S. at 605–06, 99 S.Ct. 3020 (citations omitted).

**34.** 507 Pa. 255, 489 A.2d 1317 (1985).

**35.** *Id.* at 1321–22.

**36.** *Id.* at 1322 n. 4.

a breach of contract claim because "employment disputes within churches are core ecclesiastical concerns outside the jurisdiction of the civil courts," [37] we did have jurisdiction over defamation and intentional interference with contract claims against a minister because it was not necessary to involve ourselves in qualifications for the ministry when considering the elements of the defamation claim.[38]

In *McAdoo v. Diaz,* we faced another defamation claim against a minister and, citing *Marshall v. Munro,* noted that we would allow claims against the minister for libel to proceed because they did not "touch the merits of any core religious questions" or "present a religious question." [39]

Considering our precedents, the superior court's analysis, the weight of authority favoring the neutral-principles approach, and the compelling logic of the opinion of the majority of the United States Supreme Court in *Jones,* we adopt the neutral-principles approach when resolving property disputes between religious organizations.

## C. Applying Neutral Principles to St. Paul's Claim, We Agree that the Disputed Properties Belong to AMC.

When applying neutral principles of law to resolve church property disputes, courts generally examine the deeds to the church property, the charter of the local church, the book of order or discipline of the general church organization, and the state statutes governing the holding of the church property [40] so that they may give effect to the intentions of the parties with respect to the property. Assessing these factors, the superior court concluded that the disputed properties belong to AMC.

St. Paul argues that it never intended to create a trust in favor of UMC, and finds fault with the superior court's decision, arguing that

the lower court tacitly held that *The Book of Discipline* trumped St. Paul, Inc.'s independent corporate charter, as well as St.

Paul, Inc.'s recorded property deeds. This ruling, based upon notions of hierarchy and religious deference rather than neutral principles, unconstitutionally and improperly elevated The United Methodist Church's assertion of a trust above established Alaska trust law.

Specifically, St. Paul argues that no trust can be found in favor of UMC, because: (1) there is no evidence of unequivocal intent to create the trust by the settlor, St. Paul; (2) there was no trust res at the time the trust was created; and (3) there is no document that complies with the statute of frauds. We reject each argument in turn.

### 1. Unequivocal intent to create a trust

St. Paul argues that the "language of *The Book of Discipline* does not itself constitute a 'manifestation of intent' by St. Paul, Inc. to give The United Methodist Church a beneficial interest in its property." But St. Paul seems to suggest that the articles of incorporation and the deeds to the disputed properties themselves negate intent on the part of St. Paul to create a trust. We decline to adopt either polar position and instead view the relationship between St. Paul and UMC as a whole in order to discern intent.

When St. Paul chose to affiliate with UMC, the record reveals that its members were fully cognizant of the implications of affiliation. At the time of affiliation, the Discipline expressly stated:

In consonance with the legal definition and self-understanding of The United Methodist Church ... and with particular reference to its lack of capacity to hold title to property, The United Methodist Church is organized as a connectional structure, and titles to all properties held ... by a local church ... shall be held in trust for The United Methodist Church and subject to the provisions of its Discipline.

---

**37.** 845 P.2d 424, 427 (Alaska 1993).

**38.** *Id.* at 428.

**39.** *McAdoo v. Diaz,* 884 P.2d 1385 (Alaska 1994).

**40.** *Jones,* 443 U.S. at 600–01, 99 S.Ct. 3020.

Through the February 21, 1984 letter from Bishop McConnell, the founding members of St. Paul were informed:

When a new forming religious community agrees to become a United Methodist Church they agree to its constitution, Articles of Religion, and its polity and governance. Part of its polity and governance involves property being held in trust on behalf of The United Methodist Church.

St. Paul's founders were also referred to the trust provisions of the Discipline, and told, "[y]our group needs to be sure that it really wants to be United Methodist. If so, there are certain understandings which are inherent within it . . . [including] holding property in trust on behalf of the denomination." Yet the members of St. Paul willingly presented themselves for membership in UMC and incorporated as St. Paul United Methodist Church. Furthermore, St. Paul continued to affiliate with UMC, using the "name, customs and polity of The United Methodist Church . . . in such a way as to be known to the community as a part of such denomination" [41] for almost twenty years, until the discontinuation. Given the express trust language of the Discipline and the mutually understood connectional nature of UMC, the overt acts undertaken by the members of St. Paul to affiliate with UMC constitute a manifestation of intent to create a trust in favor of UMC.

Contrary to the argument of St. Paul that it is a violation of neutral principles to rely upon provisions of the Discipline when discerning the intent of St. Paul, examining the trust provisions of the Discipline in connection with the actions of the parties is fully consonant with neutral principles. As when parties agree to be bound by the law of another jurisdiction, we faithfully apply Alaska law by honoring the secular rules by which the parties have chosen to be bound.[42] Furthermore, reliance upon trust language such as that contained in the Discipline to determine the objective intent of the parties was contemplated by and endorsed by the

United States Supreme Court in *Jones*, when it observed:

[T]he neutral-principles analysis shares the peculiar genius of private-law systems in general—flexibility in ordering private rights and obligations to reflect the intentions of the parties. Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy. In this manner, a religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of the members.[43]

Although the record is replete with evidence that St. Paul intended to affiliate with UMC, and thereby undertook to hold its property in trust in favor of UMC, St. Paul argues that as the title holder, it is entitled to the presumption that it is the absolute owner, and that presumption has not been overcome. While St. Paul is correct that as the titleholder of the disputed properties, it is entitled to the presumption that it is the owner of the disputed properties and this presumption may not be overcome by "mere surmise or conjecture," [44] the evidence in the record that St. Paul intended to create a trust far surpasses mere surmise and conjecture and is sufficient to overcome the presumption.

The deeds to the disputed properties are in the name of St. Paul United Methodist Church and they do not contain the trust clauses which the Discipline provides they "shall contain." From the absence of the trust clauses, St. Paul asks that we draw the inference that it "did not intend to impress its property with a trust in favor of the UMC." But the Discipline expressly provides that the absence of a trust clause does not relieve a local church of its connectional responsibilities to UMC if the intent of the

---

**41.** Discipline 651, ¶ 2503(6)(b).

**42.** *See, e.g., United Airlines, Inc. v. Good Taste, Inc.,* 982 P.2d 1259 (Alaska 1999) (applying Illinois law when contract provided that disputes would be governed by the laws of Illinois).

**43.** 443 U.S. at 603–04, 99 S.Ct. 3020.

**44.** *Sugg v. Morris,* 392 P.2d 313, 316 (Alaska 1964).

founders of the church to hold the property in trust is shown through "the use of the name, customs and polity of The United Methodist Church." [45] Since the deeds are recorded in the name of St. Paul United Methodist Church, the deeds are consistent with the means set forth in the Discipline to manifest an intent to create a trust.

St. Paul asks that we accord significance to the fact that on its annual report forms submitted to AMC, St. Paul "annually informed the AMC that it did *not* put the trust clause in its deeds" and that the failure of AMC to insist upon inclusion of the trust clauses constituted a waiver of the trust requirement. This argument is unpersuasive in light of the default trust provisions in the Discipline, of which St. Paul was made aware. Furthermore, the affirmative act of submitting annual reports to AMC on a yearly basis in itself constitutes yet another outward manifestation of St. Paul's intent to affiliate with UMC.

St. Paul also argues that the $25,000 GBGM mortgage is "absolutely inconsistent with any other trust interest in favor of The United Methodist Church or its affiliated entities over St. Paul, Inc.'s real property." It relies upon the provision of the Trust Agreement and Mortgage which states:

> [I]n case [St. Paul] shall cease to be connected with The United Methodist Church, or its successor, or the corporate existence of [St. Paul] shall cease, or the property hereinafter described shall ever hereafter be alienated from The United Methodist Church, or cease to be used for or be devoted to other uses and purposes than the uses [or] purposes set forth herein, then [St. Paul] shall and will forthwith repay to the party of the second part, the successors or assigns thereof, the said amount with lawful interest thereon, from the date of the aforesaid alienation, dissolution or abandonment.

However, this routine documentation of a financial transaction between two distinct entities is immaterial in the face of the manifest intent of St. Paul to affiliate with UMC. Additional language within the very same Trust Agreement and Mortgage reflects an intent on the part of St. Paul to hold the disputed properties for the use of UMC:

> [S]aid premises shall be held, kept, and maintained as a place of residence for the use and occupancy of the ministers of The United Methodist Church, who may from time to time be entitled to occupy the same by appointment, and/or[ ] used, kept, and maintained, as a place of divine worship of the United Methodist ministry and members of The United Methodist Church; subject to the Discipline, usage, and ministerial appointments of said church as from time to time authorized and declared by the General Conference of said church, and the Annual Conference within whose bounds the said premises are situated[.]

### 2. The purchase of the disputed properties after the affiliation with UMC is not fatal to a finding of a trust.

█ St. Paul notes that under trust law, the lack of the requisite trust property or res when the trust is purportedly created is fatal to the formation of an express trust. Since St. Paul did not have legal title to the disputed properties when it incorporated or became a member of UMC, it argues, no trust in favor of UMC could have been created. In support of its argument, St. Paul cites the Restatement (Second) of Trusts which provides in part:

> A trust cannot be created ... unless there is trust property in existence and ascertainable at the time of the creation of the trust. In the absence of such property there is at most an agreement to create a trust, and whether such an agreement is binding as a contract depends upon whether the requirements for the creation of a contract are satisfied.[46]

The absence of a res does not prove fatal to the imposition of a trust, however, because it is not necessary to isolate St. Paul's manifestation of intent to create a trust to the narrow window of time in which St. Paul was organized and affiliated with UMC. The de-

45. DISCIPLINE 651, ¶ 2503(6).

46. RESTATEMENT (SECOND) OF TRUSTS § 2 cmt. k (1959).

fault trust clause in the Discipline, which states that intent sufficient to create a trust in favor of UMC can be shown through "the use of the name, customs, and polity of The United Methodist Church or any predecessor to The United Methodist Church in such a way as to be thus known to the community as a part of such denomination," [47] suggests that intent to create a trust can be inferred from St. Paul's continued affiliation with UMC after it purchased the disputed properties. The Restatement (Third) of Trusts lends support to our conclusion when explaining that in a scenario in which a person gratuitously purports to declare a trust, or to make a transfer to another in trust, of a bare expectancy or nonexistent property:

> No trust arises when the person later acquires the intended trust property in the absence of some express or implied manifestation at the later time of an intent to give effect to the trust.[48]

The deeds to the disputed properties themselves, which lack the trust language urged by the Discipline, manifest the intent of St. Paul to establish a trust in favor of UMC because the deeds are in the name of St. Paul United Methodist Church. Additionally, St. Paul continued its affiliation with UMC after the purchase of the disputed properties in 1988 until the discontinuation in 2002, further demonstrating a willingness to be bound by the trust provisions of the Discipline. The fact that there was no res when St. Paul initially affiliated with UMC is therefore not dispositive.

### 3. The statute of frauds is not implicated.

██ St. Paul argues that under Alaska's statute of frauds, an agreement to establish a trust is "unenforceable unless it or some note of it is in writing and subscribed by the party charged or by an agent of that party." [49] AMC refers to the multiple indicia of intent by St. Paul to affiliate with UMC, many of which are reflected in writings subscribed to by members of St. Paul, including: (1) St. Paul's request to join UMC, (2) its Certificate of Organization, (3) the St. Paul Constituting Church Conference Register of Attendance, (4) the Report of Pastors, (5) the name St. Paul "United Methodist Church," (6) the Certificate of Religious Corporation issued by the State of Alaska to St. Paul, and (7) St. Paul's Articles of Incorporation, including the name St. Paul United Method Church. These writings are sufficient evidence of intent to form a trust to satisfy the statute of frauds.

### D. The Trust Was Not Revoked when St. Paul Amended Its Articles of Incorporation.

██ St. Paul argues that, even if a trust existed, St. Paul revoked the trust when it amended its Articles of Incorporation and deleted any reference to UMC and the Discipline. In support of its argument, St. Paul refers to AS 10.40.050, which provides that "[a] corporation formed under this chapter may alter or amend its articles of incorporation and change its seal." St. Paul also relies upon *California–Nevada Annual Conference of United Methodist Church v. St. Luke's United Methodist Church*[50] for the proposition that amending its articles had the effect of revoking the trust.

In *St. Luke's,* a California appellate court applying neutral principles upheld a trial court's determination that a trust was created in favor of UMC.[51] But the California court found that St. Luke's had subsequently revoked the trust in favor of UMC when it amended its articles of incorporation as permitted by the applicable provisions of the California Corporations Code pertaining to religious corporations.[52] The court made clear, though, that its decision was based upon the presumption in California law that unless a trust is expressly made irrevocable

---

**47.** Discipline 651, ¶ 2503(6).

**48.** Restatement (Third) of Trusts § 41, cmt. d (2003).

**49.** AS 09.25.010(a)(9).

**50.** 121 Cal.App.4th 754, 17 Cal.Rptr.3d 442, 445 (2004).

**51.** *Id.*

**52.** *Id.* at 452.

by the trust instrument, the trust is revocable by the settlor.[53]

*St. Luke's* is distinguishable because the *opposite* presumption applied under Alaska law in 1988, when the disputed properties were acquired and St. Paul's intent to create a trust was manifested through the use of the name St. Paul United Methodist Church on the deeds and through its continued affiliation with UMC. This court noted in *Alaska State Employees Association v. Alaska Public Employees Association* that "[t]rusts may be modified to the extent that the 'settlor' of the trust has reserved the power of modification." [54] While St. Paul is correct that religious corporations may amend their articles of incorporation under Alaska statute, St. Paul has presented no evidence to suggest that it reserved the right to revoke the trust and therefore was entitled to do so by amendment. We therefore conclude that St. Paul did not revoke the trust.

St. Paul raised in passing before the trial court, but not through this appeal, the question whether AS 13.36.338(a), which was enacted in 2000 and provides that "unless a trust is expressly made irrevocable, a trust executed on or after August 30, 2000 is revocable by the settlor," enables St. Paul to revoke any trust that existed. Since we conclude that the trust in favor of UMC was created in 1988 when Alaska law presumed the reverse, we deem AS 13.36.338(a) to be inapplicable. But we note that under different facts, we, like the California court in *St. Luke's*, might determine that in accordance with AS 13.36.338(a) a trust created by a

local church in favor of a parent church is revocable.

**E. No Joint Trust Was Created.**

St. Paul argues that the "lower court also erred in implicitly holding that a trust existed only in favor of [UMC]" and contends that the Discipline creates "at most a joint trust between the AMC and St. Paul, Inc." As the foundation of its argument, St. Paul cites Paragraph 2537 of The Book of Discipline, which states:

> Incorporated Local Church Property–Title and Purchase:
>
> . . . .
>
> the title to all property now owned. or hereafter acquired by an incorporated local church ... shall be held by and/or conveyed to the corporate body in its corporate name, in trust for the use and benefit of such local church and of The United Methodist Church.[55]

St. Paul emphasizes the language "in trust for the use and benefit of such local church and The United Methodist Church" to argue that, if a trust exists, it is a joint trust.

If this paragraph were read in isolation, it could perhaps lend support to St. Paul's argument. But under neutral principles, we consider the language of Paragraph 2537 of the Discipline in context, not in isolation, just as we would when interpreting a contract [56] or a statute.[57]

Immediately following the language quoted by St. Paul Church, Paragraph 2537 incorporates by reference Paragraph 2503, when it states that "[e]very instrument of conveyance

---

**53.** *Id.* at 453.

**54.** 825 P.2d 451, 460 (Alaska 1991) (citing RESTATEMENT (SECOND) OF TRUSTS § 331 (1959)); *see also In re Last Will and Testament of Tamplin*, 48 P.3d 471, 473 (Alaska 2002) (when addressing whether a will could revoke an inter vivos trust created in 1993, noting that a "trust is revocable by the settlor 'if and to the extent that by the terms of the trust he reserved such power' ").

**55.** DISCIPLINE 670.

**56.** *Cf. Matanuska Elec. Ass'n, Inc. v. Chugach Elec. Ass'n, Inc.*, 99 P.3d 553, 562 (Alaska 2004) ("The goal of contract interpretation is to give effect to the parties' reasonable expectations, which we assess by examining the language of

the disputed provisions, the language of other provisions, relevant extrinsic evidence, and case law interpreting similar provisions. In reaching a reasonable interpretation of a contract, we attempt to give effect to all of its terms, if possible. We consider disputed language within the context of the whole contract and its purposes, and the circumstances surrounding its formation.") (internal citations omitted).

**57.** *Cf. Bradford v. First Nat. Bank of Anchorage*, 932 P.2d 256, 262 (Alaska 1997) (this court "interprets each part or section of a statute with every other part or section, so as to create a harmonious whole") (citations omitted).

of real estate shall contain the appropriate trust clause as set forth in the Discipline (¶ 2503)." Paragraph 2503 provides:

> [A]ll written instruments of conveyance by which premises are held or hereafter acquired for use as a place of divine worship or other activities for members of The United Methodist Church shall contain the following trust clause:
>
> *In trust, that said premises shall be used, kept, and maintained as a place of divine worship of the United Methodist ministry and members of The United Methodist Church; subject to the* Discipline .... *This provision is solely for the benefit of the grantee, and the grantor reserves no right or interest in said premises.*[58]

Read as a whole along with the paragraph it incorporates, Paragraph 2537 undermines rather than supports St. Paul's argument that the parties intended for the disputed properties to be held in joint trust. Paragraph 2501, which sets forth UMC's general understanding about its connectional structure, also contradicts St. Paul's argument, when it states that "titles to all real and personal, tangible and intangible property ... shall be held in trust for [UMC] and subject to the terms of the Discipline." [59] We therefore reject St. Paul's argument that the trust created in favor of UMC was a joint trust.

### F. The Superior Court Did Not Err in Finding the Individually Named Appellants Personally Liable for Conversion and Trespass.

On June 23, 2004, the superior court heard oral argument and issued a written order determining that the individually named appellants were liable for trespass and conversion. St. Paul appeals, arguing that summary judgment relieving plaintiffs from personal liability should have been granted. St. Paul claims that there was no evidence that any individual personally committed any acts to constitute trespass or conversion. If the superior court's decision is based on individual acts, St. Paul argues, there is no support in the record to establish which individuals actually changed the locks, entered onto and possessed the disputed property, and took personal property. However, St. Paul admits in its briefing even before this court that St. Paul "regained control of its parsonage and church buildings, and resumed regular worship in the church." Additionally, the individually named appellants admit in their answer that they entered the parsonage against the express written objection of AMC and that they entered the church, "changed the locks, and have begun having services there."

Trespass is defined as an unauthorized intrusion or invasion of another's land.[60] An intentional entry onto the land of another constitutes intentional trespass even if the trespasser believes that he or she has the right to be on the land.[61] To establish a conversion claim, a plaintiff must prove that it had a possessory interest in the property, that the defendants intentionally interfered with the plaintiff's possession, and that the defendants' acts were the legal cause of the plaintiff's loss of property.[62]

With respect to the trespass and conversion claims the superior court found:

> [G]ood faith may go and certainly does go to issues of damages that have been raised. However, the individual defendants are liable for conversion, are liable for any damage done to property or the property that has been converted and unrecovered.
>
> Whether they did so as fiduciaries or out of their belief in a fiduciary duty to the amended entity, St. Paul Church, is not a matter before the Court, but rather one that may go to the corporate desire to

**58.** Discipline 649–50.

**59.** Discipline 649.

**60.** *Mapco Express, Inc. v. Faulk*, 24 P.3d 531, 539 (Alaska 2001) (citing *Parks Hiway Enters., L.L.C. v. CEM Leasing, Inc.*, 995 P.2d 657, 664 (Alaska 2000); Restatement (Second) of Torts §§ 158, 163 (1965)).

**61.** *Brown Jug, Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local 959*, 688 P.2d 932, 938 (Alaska 1984) (citing Restatement (Second) of Torts § 164 (1965)).

**62.** *K & K Recycling*, 80 P.3d at 717.

indemnify or reimburse for any damages or expenses, but the individuals that withheld property, broke locks, and did those things, are liable. And they are liable as of the time of their acts, not when the determination of ownership was made.

Because the individually named appellants admitted entering property and removing locks from property belonging to AMC, and a claim of right to the property is not a defense to either trespass or conversion, the superior court did not err in finding the individually named appellants liable, subject to a determination of the extent of damages.

### G. The Superior Court Did Not Err in Granting Control of the St. Paul Corporate Entity and Name to St. Paul.

In its memorandum decision dated April 8, 2004, the superior court, after determining that the Discipline expressly requires local churches to hold property in trust for the general church, awarded the disputed church and parsonage to AMC. It also found that title was quieted in the name of St. Paul, and ruled that AMC could be substituted as the legal title owner. On June 23, 2004, however, the superior court reached a different result with respect to the question of St. Paul's corporate name. Through its cross-appeal, AMC challenges the superior court's oral order granting St. Paul control of the St. Paul corporate entity and the name "St. Paul."

As a preliminary matter, we address AMC's argument that the individually named appellants lack standing to assert a claim for the St. Paul corporate entity and name. AMC moved to dismiss the answer and the counterclaims of the individually named appellants for lack of standing on April 22, 2004. At oral argument on June 23, 2004, Superior Court Judge Richard D. Savell noted that he was confused about the motion because it appeared from the pleadings that the individually named appellants had not raised any counterclaims. According to the responsive pleadings to the original complaint and the amended complaint, the counterclaim against AMC for theft was in fact only brought in the name of St. Paul Church, Inc., f/k/a St. Paul United Methodist Church. The following exchange took place between the superior court and AMC's counsel at oral argument on this issue:

> Mr. Sheehan: If there are no individual claims, then they have no standing to assert—I mean, one of the issues that was raised in the motion was whether they have standing to assert a claim on behalf of St. Paul.
>
> The Court: All right. They haven't made one. So I don't care if they have standing. The church has counterclaimed for conversion, and I'm prepared to address that as part of the whole package.
>
> Mr. Sheehan: Okay.

No further argument in favor of the motion was made, and on August 2, 2004, the superior court issued an order denying AMC's motion.

AMC appeals, asking that the superior court's June 23, 2004 oral ruling be vacated. AMC makes the argument that the individually named appellants are only five of sixty-two members of the congregation of St. Paul and as such a minority, they have no standing to represent St. Paul, amend its Articles, and claim the St. Paul corporate entity and name. AMC has not addressed in its appeal the fatal flaw identified by the superior court—that the individually named appellants are not parties to this litigation as claimants.[63] Instead, they were brought into this litigation in their individual capacities solely to defend claims brought by AMC.

Further, it is clear from the motion of St. Paul for summary judgment, which resulted in the award of the St. Paul name and corporate existence to St. Paul, that the corporate entity was claiming legal title to the disputed property on its own behalf, and the individually named appellants only offered defenses to personal liability. While some of the individually named appellants are also officers of the corporation, it does not follow that they were making claims to the name and corpo-

---

**63.** For this reason alone, we would affirm the superior court. *See Petersen v. Mutual Life Ins. Co. of New York,* 803 P.2d 406, 411 n. 8 (Alaska 1990) (finding that an argument was waived where appellant failed to "advance any *legal argument* as to why the court erred").

rate existence of St. Paul on their own behalf. The superior court therefore did not err when it denied AMC's motion to dismiss for lack of standing because the individually named appellants were in fact asserting no claims.

■■■ Finding AMC's jurisdictional arguments unpersuasive, we turn to the substance of the superior court's order granting control of the St. Paul corporate entity and name to St. Paul. In its decision, the superior court reasoned that "it was responsible for [St. Paul] to amend the documents by which they continued their association, affiliation and worship." The name "St. Paul Church is not one that belongs to the Alaska Missionary Conference. St. Paul United Methodist Church does. They have abandoned that . . . and . . . their corporate status, is not, in view of this change . . . something they will be divested of." The superior court further explained that

the corporate entity is the legal recognition of the name, and they changed that, and in effect, by changing it . . . changed the character of it so that it was not the property of The United Methodist Church because it is not that which formed the relationship and was part of the documents and the . . . affiliation.

And the interest of the United Methodist Church in having nonaffiliated churches use the name "Methodists" is preserved. Anyone can name their church after any saint they wish, and they have done so here.

The superior court's conclusion that there is an analytical distinction between the corporation as a separate legal entity and the religious society which may bind itself to a hierarchical organization is both persuasive and supported by authority. According to American Jurisprudence

[a] church society, by incorporating, does not lose its existence or become wholly merged in the corporation. The religious corporation and the church, although one may exist within the pale of the other, are in no respect correlative. The objects and interest of the one are moral and spiritual; the other deals exclusively with things temporal and material. Each as a body is entirely independent and free from any direct control or interference from the other.[64]

In a situation such as that before this court, where a local church is involuntarily disassociated from a national denomination, the equities and neutral principles of law favor respecting the integrity of the separate legal existence of the corporation. Therefore, we affirm the decision of the superior court awarding the St. Paul corporate existence and name to St. Paul.

AMC argues that since the Discipline provides that all properties, tangible and intangible, be held in trust for UMC,[65] and under the Discipline discontinuance places all of a local church's properties under the control of the annual conference trustees,[66] AMC is entitled to St. Paul's personal property, its corporate existence, and its intangible property, and its name "St. Paul United Methodist Church, Inc." AMC, however, cites no case law to support its position and relies instead upon the provisions of the religious corporation statute and its own interpretation of its authority under the Discipline to succeed to the office of "corporation sole" [67] under AS 10.40.110.[68] Because we find that

---

64. 66 Am.Jur.2d, *Religious Societies* § 5 (2005).

65. Discipline 649, ¶ 2501.

66. *Id.*

67. AS 10.40.060 provides:

Upon the filing of the articles of incorporation for record the person subscribing the articles and a successor in office by the name or title specified in the articles is a corporation sole, with continual perpetual succession.

68. AS 10.40.110 addresses succession to property when a corporate sole is removed, providing in relevant part:

In the event of the death or resignation of the archbishop, bishop, president, *trustee in trust,* president of stake, president of congregation, overseer, presiding elder, or member of the clergy, *who has formed a corporation under this chapter, or such a person's removal from office by the person or body having removal authority, the successor in office as the corporation sole is vested with the title of all property held by the successor's predecessor with the same power and authority over the property,*

under neutral principles, St. Paul exists as a legal entity independent of its affiliation with UMC, we need not and would not delve into the matters of power allocation within UMC implicated by AMC's argument.[69]

## IV. CONCLUSION

We adopt the neutral-principles approach to resolving property disputes among religious organizations. Applying neutral principles, we agree with the superior court that a trust was created by St. Paul in favor of UMC, and therefore AFFIRM.

Because the individually named appellants have admitted acts that would establish trespass and conversion, we AFFIRM the superior court's conclusion that they are liable. We also AFFIRM the superior court's order denying AMC's motion to dismiss the claims because the individually named appellants have not asserted any claims. Finally, we AFFIRM the superior court's decision that St. Paul is entitled to maintain its own name and corporate existence.

MATTHEWS, Justice, not participating.

---

*subject to all the legal liabilities and obligations with reference to the property.*
(Emphasis added.)

**69.** *See, e.g., Maryland & Virginia Eldership of the Churches of God v. Church of God of Sharpsburg,* 396 U.S. 367, 369, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970) ("Under *Watson* civil courts do not inquire whether the relevant church governing body has power under religious law to control the property in question. Such a determination, unlike the identification of the governing body, frequently necessitates the interpretation of ambiguous religious law and usage. To permit civil courts to probe deeply enough into the allocation of power within a church as to decide where religious law places control over the use of church property would violate the First Amendment in much the same manner as civil determination of religious doctrine.").